The GLOBE SAVINGS BANK, F.S.B.
and Phoenix Capital Group, Inc.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1550C.

United States Court of Federal Claims.

Dec. 19, 2003.

Melvin C. Garbow and Howard N. Cayne, Arnold & Porter, Washington, D.C., argued for plaintiffs. With them on the briefs was Walter F. Zenner.

Luke Levasseur, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., argued for defendant. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, John N. Kane, and Tonia Tornatore, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This *Winstar*-related case[1] concerns a thrift banking institution located in Oklahoma. The government's liability for breach of contract has been established, *see Globe*

*Sav. Bank, FSB v. United States,* 55 Fed.Cl. 247 (2003) (granting plaintiffs' motion for partial summary judgment on liability and denying defendant's cross-motion), but the amount of damages has not. Before the Court is defendant's motion for summary judgment on damages, respecting which a hearing was held on November 7, 2003. The motion is granted in part and denied in part for the reasons stated below.

## BACKGROUND

OK Federal Savings and Loan Association ("OK Federal") located in El Reno, Oklahoma, had become insolvent by May 1984. *Globe Sav.*, 55 Fed.Cl. at 249. OK Federal was insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"), which took an active role in its restructuring. On April 18, 1985, OK Federal entered into a consent agreement with the Federal Home Loan Bank Board ("Bank Board" or "FHLBB"), allowing the Bank Board to seek an acquirer or merger partner for OK Federal and to replace its management, and restricting the operations OK Federal could conduct without prior approval. *Id.* Several weeks later on May 1, 1985, FSLIC took the lead from the Bank Board in seeking an outside investor or acquiror. *Id.*

For over a year, neither FSLIC nor the Bank Board received any acceptable proposals. However, on July 31, 1986, Phoenix Capital Group, Inc. ("Phoenix") submitted a proposal to acquire OK Federal. *Id.* Phoenix was a Delaware holding company expressly organized to acquire OK Federal. *See* Appendix to Plaintiffs' Motion for Partial Summary Judgment on Liability ("Pls.' Liab. App."), Ex. 4 at App. 49 (Acquisition Proposal (July 31, 1986)). Phoenix proposed that OK Federal convert from a mutual savings and loan association to a stock corporation, that Phoenix contribute $3 million in cash for all the newly issued stock, that FSLIC contribute cash to offset OK Federal's net worth deficit and provide other indemnifications, and that the Bank Board provide regulatory forbearances. *Id.* at App. 37–40. Those pro-

1. *See Winstar Corp. v. U.S.,* 25 Cl.Ct. 541 (1992) ("*Winstar I*"), aff'd, 64 F.3d 1531 (Fed.Cir.1995) (en banc) ("*Winstar II*"), aff'd, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

posed forbearances included treating FSLIC's proposed capital contribution as a direct addition to the resulting institution's net worth and creating supervisory goodwill as an asset for regulatory purposes through "push-down" accounting and then amortizing the goodwill over a 25–year period by the straight-line method. *Id.* at App. 45–46.

Negotiations over the proposal proceeded slowly. Phoenix's business plan was the major stumbling block. *Globe Sav.*, 55 Fed.Cl. at 250. The proposed capital credit and supervisory goodwill were not controversial. *Id.* at 251. A business plan submitted by Phoenix on October 24, 1986, provided a very detailed and definite strategy for the proposed new entity. *See* Pls.' Liab.App., Ex. 6 (Globe Savings Bank Business Plan (Oct. 24, 1986)). Under the plan, Phoenix sought to leverage the capital credit and supervisory goodwill of the proposed new thrift to expand its assets by employing a risk-controlled arbitrage program. *Id.* at App. 78, 81–82, 91–92. The thrift would diversify its credit risk and minimize its overhead costs by investing primarily in mortgage-backed securities funded through insured deposits and wholesale borrowings. *Id.* at App. 66, 79. The plan described various hedging techniques through which assets would be "duration matched" with the liabilities used to fund those assets so as to manage interest rate risk. *Id.* at App. 82–83. In addition, the business plan envisioned that once the thrift reached its break-even point, projected to be near the end of the second year, additional growth in net interest income would result in almost dollar-for-dollar net profit. G–App. 35.[2] Finally, the thrift's accumulated tax losses, *i.e.*, its net operating loss carryforwards, would shelter the entity's profits from taxes for some years. *Id.*

In a viability analysis performed on February 20, 1987, the Bank Board concluded that Phoenix's proposed new thrift could be practicable provided it employed both a high level of expertise and proper hedging techniques in implementing its strategy. P–App. 0105. In response to the Bank Board's concern

that the new thrift's initial growth was projected both to be rapid and based entirely on the proposed capital credit and goodwill forbearances, Phoenix submitted revised business plans using lower growth projections and a higher capital requirement. *See* Pls.' Liab.App., Ex. 7 at App. 225 (Business Plan revised Mar. 10, 1987); *id.*, Ex. 8 at App. 303–307 (Letter from G.E. O'Shaughnessy, Phoenix, to Robert Sahadi, FHLBB (May 28, 1987)). The Bank Board's analysis of the revised plan for the thrift indicated it could be viable, *id.*, Ex. 9 (analysis dated June 18, 1987), and the Principal Supervisory Agent ("PSA") of the Federal Home Loan Bank of Topeka ("FHLB–Topeka") recommended approval of the revised version of the risk-controlled arbitrage program as a "prudent strategy" for the new thrift. *Id.*, Ex. 10 at App. 337 ("S" Memorandum (June 29, 1987)). *See also id.*, Ex. 11 (FSLIC Issues Memorandum (July 9, 1987)); G–App. 952, 957–58 (FSLIC's recommendation of approval).

On July 22, 1987, the Bank Board approved the supervisory conversion of OK Federal into a stock company and the acquisition of that company by Phoenix. Pls.' Liab.App., Ex. 12 (FHLBB Resolution No. 87–793 (July 22, 1987)). As part of Phoenix's contract with the government, an Assistance Agreement and a Regulatory Capital Maintenance Agreement ("RCMA") were entered, and a Forbearance Letter was issued. Phoenix invested $3 million in cash in the newly organized thrift, named the Globe Savings Bank, F.S.B. ("Globe"), Phoenix furnished the government with a $3 million irrevocable letter of credit, and Globe received cash assistance of approximately $54.8 million. *See id.*, Ex. 14 at App. 391–94. In addition, the Bank Board agreed that Phoenix could (1) use push-down accounting to reflect the acquisition of Globe; (2) count FSLIC's cash contribution toward regulatory capital; and (3) amortize the capital credit and the supervisory goodwill over a period of up to twenty-five years. *Id.*, Ex. 12 at App. 355. Pursuant to the terms of the contract, Phoenix acquired Globe, and Globe included in its regulatory capital the cash contribution made

---

**2.** The government numbered the appendix to its memorandum supporting the motion for summary judgment on damages as G–App. xx.

Plaintiffs accordingly numbered the appendix to their response in opposition to the government's motion as P–App. xx.

by FSLIC and approximately $6.8 million of supervisory goodwill resulting from push-down accounting. *Id.*, Ex. 27 at App. 585 (FDIC Examination Report (Oct. 19, 1989)). Globe amortized the capital credit over twenty-five years and the goodwill over the projected life (approximately ten years) of the acquired assets (principally mortgage loans).[3]

At its inception, Globe was insolvent on a tangible capital basis[4] but showed positive regulatory capital because of the capital credit and supervisory goodwill. G–App. 43, 46. It had a negative net worth of $6.8 million on a tangible basis, but a positive net worth of $57.7 million on a regulatory basis. G–App. 46. The Bank Board assuaged its concern that Globe's initial growth would be supported entirely by intangible capital by requiring Globe to maintain a minimum capital ratio of 6% for five years and 5% thereafter, a level higher than the then-existing regulatory requirement of 3%. G–App. 41.

After the closing of the Phoenix–Globe–OK Federal transaction on July 31, 1987, Globe moved rapidly to implement its somewhat unusual business plan. At the time of Phoenix's acquisition, Globe had $97.8 million in assets. G–App. 101 (Deloitte & Touche Annual Audit Report). In roughly two years, Globe grew to an asset base of approximately $735 million, with the great bulk of its assets comprised of credit-guaranteed mortgage-backed securities. G–App. 1244 (Regulatory Plan as of Sept. 22, 1989). Globe equally rapidly became profitable. Its overall results went from a loss of $348,000 in its first year (fiscal year 1988), to profits of $4.5 million in fiscal year 1989. G–App. 101.

Concurrently with its purchase of credit-guaranteed mortgage-backed securities, Globe took steps to expand its retail customer base. In April 1988, Globe purchased from FSLIC $143.5 million of deposit accounts held by First Federal Savings and Loan of Shawnee ("Shawnee"), an insolvent savings and loan association located in Shawnee, Oklahoma, along with Shawnee's five branches. G–App. 52; Hr'g Tr. at 64. Globe "paid" FSLIC a deposit premium by accepting the deposits amounting to $143.5 million in return for $139.8 million of cash from FSLIC. G–App. 52 n. 10; Hr'g Tr. at 64. The net cost to Globe was thus $3.7 million. FSLIC had tried to sell Shawnee to a number of banking institutions but had received only one other bid apart from that tendered by Globe. G–App. 52. Prior to accepting Globe's bid, FSLIC and FHLB–Topeka had assessed the ability of Globe's regulatory capital structure to support additional deposits. Pls.' Liab.App., Ex. 19 (Bank Board Executive Summary (April 6, 1988)). That capital structure was affected by the Shawnee transaction. Globe accounted for its purchase premium of $3.7 million as an amortizing intangible asset. G–App. 52. Globe's tangible capital was reduced by a like amount, resulting in a reduction in Globe's tangible capital to negative $10.5 million. *Id.* The Bank Board's summary indicated that Globe nonetheless had good prospects: ."The management of Globe, in the [FHLB] of Topeka's opinion, is adequate and has expertise in risk arbitrage such that Globe will become and continue to be profitable." Pls.' Liab.App., Ex. 19 at App. 494.

Globe used the Shawnee deposits to support its leveraging operations. Globe invested the Shawnee deposits in income-producing

---

3. As the Federal Deposit Insurance Corporation ("FDIC") stated in its 1989 examination of Globe:

> Cash assistance provided by FSLIC totaled $54,789,000 .... [This amount] is treated as a forbearance for the purposes of regulatory capital requirements and is being amortized on a straight[-]line basis over 25 years for regulatory reporting purposes only....
>
> The acquisition of the bank was accounted for under the purchase method of accounting with supervisory goodwill of $6,881,700 created through push-down accounting.

Pls.' Liab.App., Ex. 27, App. 585.

FSLIC later paid Globe an additional $3.85 million to resolve disputes under the Assistance Agreement. *Id.*

4. For this purpose, "tangible capital" is used as the term was defined under contemporaneous regulations, *i.e.*, as "the amount of equity capital as determined in accordance with generally accepted accounting principles minus goodwill and other intangible assets plus qualifying subordinated debt ... and qualifying nonpermanent preferred stock." 12 C.F.R. § 563.9–8(b)(12) (1989) (internal references omitted).

assets and pledged those assets as collateral for further borrowings. G–App. 53. Following the acquisition, Globe had approximately $200 million of deposits, and Globe avers that it had established credit lines for approximately $1 billion of wholesale borrowings. *Id.*

The enactment on August 9, 1989 of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), prevented thrifts from counting capital credits and goodwill as capital for regulatory purposes.[5] The Office of Thrift Supervision ("OTS"), the Bank Board's successor under FIRREA, adopted interim regulations implementing FIRREA's new capital requirements on November 8, 1989, to be effective December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989). Promptly thereafter, on November 17, 1989, Globe received a letter from OTS advising that Globe would not meet the new requirements and directing Globe to submit a capital restoration plan by January 8, 1990. Pls.' Liab.App., Ex. 24 at App. 581. On December 22, 1989, OTS sent Globe a letter specifically advising that "existing forbearances ... will not be extended nor will new forbearances be granted." *Id.*, Ex. 25 at App 582.

Among other things, OTS required Globe to make five-year projections of its financial condition and injuries assuming various scenarios, data, and measurements—all prescribed by OTS. G–App. 67. Specifically, OTS directed Globe to prepare these projections in accordance with OTS Thrift Bulletin 36 (Nov. 6, 1989), which required use of existing interest rate relationships, and Thrift Bulletin 36–1 (Dec. 14, 1989), which listed then-existing interest rates, provided a five-year interest-rate forecast, and specified what as-

sumptions should be made respecting spreads and prepayments. G–App. 70–71.

In early April 1990, Globe submitted its projections and supporting data to the government. G–App. 114–254. For the non-breach scenario, Globe projected that it would grow to $1.6 billion in assets over the future five-year period. G–App. 132. For the scenarios in which Globe was to assume varying degrees of breach by the government and corresponding shrinkage of Globe's assets, the projections showed that Globe would not be viable. G–App. 140–229. In late April 1990, OTS confirmed to Globe that the regulatory forbearances granted in 1987 were abrogated. G–App. 1364 (Letter from Louis V. Roy, OTS, to William D. Williams, Globe (Apr. 23, 1990)) ("Thrift Bulletin Nos. 36a and 38–2 have established that all capital forbearances ... have been superceded by the passage of the FIRREA. Globe's accounting forbearance has been determined to be in effect a capital forbearance.").

OTS's action in accord with FIRREA caused Globe to be out of compliance with regulatory capital requirements, and, in the words of OTS, rendered Globe's business plan "unworkable." Pls.' Liab.App., Ex. 30 at App. 620–21 (OTS Report of Examination (Feb. 4, 1991)). Counting the capital credit and supervisory goodwill, Globe's total regulatory capital in December 1989 was $59.6 million, G–App. 256 (Globe's Thrift Financial Report for December 1989), while its tangible capital was only approximately $3 million. G–App. 268 (Globe's Thrift Financial Report for March 1990).

Taking FIRREA into account, the FDIC assigned Globe an overall regulatory rating of "5," the worst possible rating, reserved for institutions "with an extremely high immediate or near term probability of failure." Pls.' Liab.App., Ex. 27 at 587 (FDIC Report of Examination (Oct. 19, 1989)).[6] In an endeav-

**5.** FIRREA established new capital standards as follows: "tangible" capital was to be maintained at a level "not less than 1.5 percent of the savings association's total assets," "core" capital was required to be "not less than 3 percent" of total assets, and "risk-based" capital was required to be kept at a level not "materially" lower than that required for national banks. 12 U.S.C. § 1464(t)(2). Supervisory goodwill and other unidentifiable intangible assets could not

be counted towards tangible capital and were to be phased out of calculations for "core" capital by 1995. *Id.* § 1464(t)(3)(A), (t)(9)(A)-(C).

**6.** The FDIC explained the prospects for an institution with such a rating as follows: "In the absence of urgent and decisive corrective measures, these situations will likely require liquidating and the payoff of depositors, disbursement of insurance funds to insured depositors, or some

or to comply with FIRREA's capital requirements and to avoid seizure,[7] Globe began rapidly to shrink in size, starting in February 1990 to sell assets to increase its capital-to-assets ratio. G–App. 77–78. *See also* Pls.' Liab.App., Ex. 30 at App. 622. By the end of 1990, Globe reduced its assets from more than $700 million to approximately $70 million. G–App. 78. *See also* Pls.' Liab.App., Ex. 30 at App. 622–23; Ex. 31 at App. 643 (FDIC Report of Examination (Apr. 24, 1992)).

The bulk of the assets sold consisted of mortgage-backed obligations, and the sales were accompanied by an unwinding of the corresponding wholesale borrowings and hedging transactions, most of which consisted of matched-duration FHLB advances or reverse repurchase agreements. G–App. 60, 78. In addition, in December 1990 Globe also sold six of its seven branches to Mid-First Bank, realizing a small core deposit premium of 0.7% on the sale. G–App. 78–79, 284 n.C. As a consequence of this drastic shrinkage, Globe came into compliance with FIRREA's capital requirements, Pls.' Liab. App., Ex. 30 at App. 622, and OTS accordingly raised Globe's overall regulatory rating to a "2." *Id.* at App. 618. Similarly, the FDIC's examiners found that Globe had "sold off assets and deposit liabilities in impressive fashion to meet regulatory capital requirements." G–App. 79 (quoting FDIC Report of Examination). The FDIC raised Globe's overall regulatory rating to a "3," or "adequate," based on the improved capital ratios resulting from the shrinkage. *Id.*

Thereafter, Globe completed the liquidation of its remaining assets and branch,[8] realizing a net profit of $4.7 million over the cash that it had infused into Globe at the outset of the Phoenix–Globe–OK Federal transaction at the end of July 1987. Hr'g. Tr. at 6.

## DISCUSSION

### A. Standard For Decision

A summary judgment should be rendered if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rules of the United States Court of Federal Claims ("RCFC") 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue of material fact exists if a rational finder of fact could reach only one reasonable conclusion. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, a court must resolve any doubt over a factual issue in favor of the nonmoving party. *Id.* at 587–88, 106 S.Ct. 1348.

Rule 56 places on the party moving for summary judgment the initial burden, which "may be discharged by 'showing' that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant makes such a showing, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); *see also Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348. In satisfying its burden, the party opposing summary judgment may rely on "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

### B. Expectancy Damages

Compensation through damages is the basic means of redressing a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* ("*Williston*") § 64:1 at 5 (4th ed.2002). "One way the law makes the non-breaching party whole is to give him the benefits he expected to

---

form of emergency assistance, merger or acquisition." Pls.' Liab.App., Ex. 27 at App. 587.

7. Seizure was foreshadowed by a telephone call from the FDIC to Globe on March 28, 1990, to schedule a liquidation examination. G–App. 74. At an ensuing meeting the next week in Dallas,

Globe's management was told not to "take it personally" if the FDIC seized Globe. *Id.*

8. Globe had retained a branch located in Harrah, Oklahoma. The Harrah branch's depositors were paid off as a part of Globe's ultimate liquidation. G–App. 284 n.D.

receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing *Restatement (Second) of Contracts* § 344(a) (1981) (hereafter *"Restatement Contracts"*)). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Id.* (citing *Restatement Contracts* § 347). *See also Williston* § 64:2 at 30 ("ordinarily the damages awarded following a breach seek to protect the promisee's expectation interest, including the recovery of any profits lost or other consequential harm suffered as a result of the breach").

Through pleadings, expert reports, and arguments, Globe claims damages based upon three different theories: first, lost profits; second, "other losses" consisting of incidental damages as an adjunct to expectancy damages; and, third, expectancy damages measured by "cost of replacement capital."[9] By its motion for summary judgment on Globe's damage claims, the government asks this Court to reject each of these grounds for awarding damages, with the possible exception of several categories of incidental damages. Def.'s Mot. 2–3, 37–39; Hr'g Tr. at 8–11. The analysis that follows shows that the government is entitled to partial summary judgment in its favor as to one of Globe's asserted grounds for damages and part of another ground, but not as to the other grounds and elements, which are remitted for trial.

*1. Lost profits.*

Proximate and foreseeable lost profits that can be proved with reasonable certainty provide the customary remedy for a breach of contract. According to the Federal Circuit,

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement .... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1349 (Fed.Cir.2001) ("*Cal Fed*") (quoting *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1022–23 (Fed. Cir.1996)). In the Federal Circuit, the standard governing recovery of lost profits is stated as a three-part test:

> (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

9. Under the classification of contractual damages set out in the Restatement Contracts, each of Globe's three asserting bases for assessing damages falls under the "expectancy" rubric. Section 344 of the Restatement Contracts describes the types of contractual damages in the following terms:

> § 344. Purposes of Remedies
> Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee:
> (a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,
> (b) his "reliance interest," which is his interest in being reimbursed for loss caused by

reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or
> (c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.
Expectancy damages are defined by Section 347 of the Restatement to include "(a) the loss in value to [the injured party] of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that [the injured party] has avoided by not having to perform." In many circumstances, an "incidental loss" included in expectancy damages under Section 347(b) also might be considered part of "reliance" damages. *See infra* at 97.

*Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002) (citations omitted). Of particular relevance to the instant case, the Federal Circuit has emphasized that "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal Fed,* 245 F.3d at 1350 (citation omitted).

Globe and Phoenix retained Mr. William Douglas Williams, a certified public accountant and former chief executive officer of Globe, as an expert witness to identify and quantify expectancy damages. G–App. 6–9 (Expert Report of William D. Williams (Nov. 5, 1999)). Mr. Williams's calculation of Globe's lost profits has two components: (1) lost profits Globe would have made absent the breach during the 1990s by continuing to follow its business plan; and (2) post–1999 lost profits determined on the basis of Globe's residual branch value at the end of 1999. G–App. 9–10, 81–83. Mr. Williams calculated Globe's lost profits in the 1990s to be $55.8 million based on Globe's business plan, its investments and financial performance prior to the breach, and a modified version of the non-breach scenario set out in its April 1990 projections made at the behest of OTS, all of which are discussed *supra,* at 87–91. G–App. 10–11, 81–82, 83–88. As post–1999 lost profits, Mr. Williams added $13.3 million as the value of the core deposit premium that Globe could have realized in a sale of its deposit base at the end of 1999. G–App. 89–90.

The government argues that both components of Globe's and Phoenix's lost profits claim fail all three of the Federal Circuit's requirements, *viz.,* reasonable certainty, causation, and reasonable foreseeability. The government relies on *Southern National Corp. v. United States,* 57 Fed.Cl. 294 (2003), and *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223 (2003), both of which granted motions by the government for summary judgment with respect to thrifts' lost-profits claims. *See* Mot. at 15; Hr'g Tr. at 13, 26. Based on those precedents, the government contends that Mr. Williams's failure to offer an "opinion concerning the specific investments Globe would have made, or even the classes of MBS [mortgaged backed securities] in which it would have invested," fatally wounds Globe's and Phoenix's claim. Mot. at 14–15. Globe and Phoenix counter that Mr. Williams looked to Globe's pre-breach portfolio of $735.57 million in assets as of September 30, 1989, consisting principally of mortgage-backed securities, to show the investments that Globe had made and would make and define the investment opportunity Globe would have pursued. Opp'n. at 13–15, 17–18. *See also* G–App. 78 (Williams's expert report, quoting FDIC Report of Examination of Globe (Apr. 24, 1992)). Globe and Phoenix maintain that Globe's two-year history of making large investments in mortgage-backed securities accompanied by using financial instruments to hedge against interest-rate changes provides a strong track record for a lost-profits calculation. Opp'n. at 12–23.

In *California Federal,* the Federal Circuit vacated a summary judgment granted by this Court in favor of the government on a lost-profits claim where the plaintiff bank had "offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets that it allegedly had to sell to remain in capital compliance." 245 F.3d at 1350. After that decision, judges of this Court have denied motions by the government for summary judgment on lost profits, relying on the observation of the Federal Circuit in *California Federal* that the existence and amount of lost profits are factual matters that should not be decided summarily if material facts are in dispute. *E.g., Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. 126, 2003 WL 22415878 (Fed.Cl. Sept.29, 2003); *Citizens Fin. Servs., FSB v. United States,* 57 Fed.Cl. 64 (2003); *Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108 (2003); *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693 (2002); *Citizens Fed. Bank, FSB v. United States,* 52 Fed.Cl. 561 (2002). As the Court in *Fifth Third* recognized, "[a]fter [*California Federal*], it would be the *rara avis,* indeed, that could merit summary judgment [on lost profits]." 55 Fed.Cl. at 236.

That "rare bird" was found to be present in the two cases upon which the government relies. In each, the Court found the claiming thrift's proffered evidence to be insufficient to constitute a basis for finding lost profits to a reasonable certainty, where the expert report did "not attempt to customize the but-for world by identifying types or categories of investment opportunities that [the thrift] would have exploited or by recognizing competition." *Southern Nat'l*, 57 Fed.Cl. at 306. *Accord Fifth Third*, 55 Fed.Cl. at 240–42. In *Southern National*, the plaintiff's expert, when asked during his deposition whether the bank's business practices would have differed absent the breach, replied:

> [I]t's difficult to divine what the company might have done in a nonbreach world in terms of changing the way it did business .... [W]hat I've done is make what I believe to be the most reasonable and reliable assumption, and that is, that the company would not have been operated materially differently in the nonbreach world. It would have just been a larger company.

57 Fed.Cl. at 305 (alterations in original). Similarly, in *Fifth Third*, the bank's expert testified at his deposition, "I don't believe there is any information in the record that indicates that there were additional opportunities to grow ... that the actual bank could have taken advantage of." 55 Fed.Cl. at 240.

In contrast to the deponents in those cases, Mr. Williams identified at his deposition types and categories of investments Globe would have pursued absent the breach. For example, Mr. Williams testified that "[w]e would have looked at all the different types of mortgage-backed securities." G–App. 662.1 (Dep. of William D. Williams

(Feb. 29, 2000)). *See also* G–App. 659 ("What we can know, as the government mandated us to project forward, was to basically use mortgage-related securities and the spreads known in the marketplace at that time."). He specified adjustable-rate mortgages and fixed-rate CMOs as particular types or categories of investments Globe would have exploited. G–App. 661–663. Mr. Williams testified that such types or categories of investments were available at the time in question. G–App. 662.1–663.[10]

In his lost profits calculations, Mr. Williams posited that, absent breach, Globe would have expanded its mortgage-backed securities from the amount held late in 1989, approximately $735 million, to holdings of $1.032 billion, G–App. 80, 86. He relied on the facts that pre-breach lines of credit were available to support that level of credit-guaranteed, mortgage-backed assets, G–App. 86, and that growth to that level was reflected in the business plans that Globe had submitted to FHLB–Topeka in obtaining approvals for its formation upon the purchase of OK Federal's assets from FSLIC, for the acquisition from FSLIC of the Shawnee branches, and for loans and advances from FHLB–Topeka. G–App. 83. As Mr. Williams stated, "Globe strictly adhered to its approval business plan of leveraging its forbearance capital into a large volume of income-producing, mortgage-related assets and seeking a small but steady spread on those assets." *Id.* Thus, "in determining Globe's lost profits damages, there is no need to guess or speculate as to what Globe's business plan would have been or what lines of business Globe would or would not have been in." *Id.* Based on the template for Globe supplied by its 1987–89 experi-

---

**10.** In finding the lost-profits measure of damages to be speculative as a matter of law on the facts at hand in *Southern National* and *Fifth Third*, the Court in those cases relied to some extent on the experts' failure to consider in their calculations the effect of competition from other banks. 57 Fed.Cl. at 305; 55 Fed.Cl. at 241. The government draws on that reliance to argue here that *Fifth Third* "recognized that a *Winstar* plaintiff's failure to analyze and adjust its model to account for all effects of the non-breach world is fatal to the legal viability of a lost profits claim." Mot. at 25. *Fifth Third* stands for no such proposition. In the words of the Court in that case, "the Federal Circuit in *Cal Fed* did not state or imply

that these types of evidence were exhaustive;" rather, they "reflect the nature and quality of evidence that the Federal Circuit ruled sufficient to withstand a summary judgment motion." *Fifth Third*, 55 Fed.Cl. at 241. Here, Globe's government-approved business plan, its successful operation under that plan for more than two years, the non-breach scenario provided to OTS in accord with OTS-prescribed assumptions in the April 1990 projections, and the deposition testimony of Mr. Williams more than suffices for the purpose of establishing Globe's case for lost-profits damages to withstand summary judgment.

ence, Mr. Williams projected lost profits during the 1990s for Globe of $55.8 million. G–App. 86.

The government puts forward one subsidiary contention that bears on a detailed aspect of Mr. Williams's projection. The government asserts that Mr. Williams's interest-rate spread used in his calculations was too large because of his assumption that Globe's spread income would hold steady as its portfolio grew. Reply at 10–11. The government argues that "Globe's spread was almost cut in-half [*sic*] as its asset size increased." *Id.* at 11. This argument, however, goes to a particular element of Mr. Williams's lost-profits model, and not to whether a lost-profits calculation is appropriate. Indeed, the government's contention regarding interest-rate spreads merely demonstrates that genuine disputes of material fact exist regarding a lost-profits computation for Globe, and that those disputes should be resolved through trial.

Most importantly, the government's position against any lost-profits measure of damages is doomed by the extensive portfolio of hedged mortgage-backed securities that Globe held at the time of the breach. That portfolio by itself could constitute a basis for substantial damages measured by lost profits, and there could be nothing speculative about the content of that portfolio. A further expert witness retained by Globe, Mr. Andrew Davidson, analyzed the maturity "runoff" of Globe's portfolio as of December 31, 1989, showing the principal balance on a month-by-month basis from January 1990 through July 1999. P–App. 0094. Mr. Davidson also set out in tabular form the net interest income from Globe's portfolio by month for each month from January 1990 through August 1999. P–App. 0095. This computation showed a net interest income of $22.984 million for the 1990s, based solely on Globe's asset portfolio in existence at the time of the breach. *Id.*[11] Thus, lost-profits computations in the particular factual setting of this case have a high probability of showing some level of lost profits to a reasonable certainty, and summary judgment in the government's favor cannot be granted as to the lost-profits measure of damages covering the 1990s.[12]

For similar reasons, summary judgment cannot be granted in the government's favor respecting the post–1999 component of lost profits. As noted previously, Mr. Williams derived that component by measuring the residual value of Globe's branch network. *See supra,* at 93. Globe's theory is that breach of the capital-forebearance contract proximately caused lost profits extending past 1999, that these lost profits are bound up in and encompassed by Globe's branch network, and that actual experience is available to value Globe's branch network as of the end of 1999. G–App. 89–90. The government contests Globe's theory regarding a measure for post–1999 lost-profits damages on the grounds that Globe's "yardstick" is speculative and that the resulting measure fails the "reasonable certainty" test. Mot. at 27–32. Many of the government's objections focus on Globe's management of its branch offices. *Id.* at 28–29. The government points out that during Globe's operations, its branch deposits declined from $227 million in April 1988 after the Shawnee acquisition to $189.8 million in December 1989. *Id.* at 28. The government argues that Globe's expert, Mr. Williams, looked to the operations of the branches by MidFirst Bank, the purchaser of six of the seven branches in December 1990, as the yardstick for the value of the branches nine years later in Globe's hands, and that Globe's operation of the branches was not necessarily comparable to that of MidFirst and thus does not suffice for establishing a baseline to determine damages. *Id.* at 28–29. These contentions by the government respecting Globe's measure for post–

---

11. Net interest income does not correlate directly to net or "lost" profits because that income would not take into account operating and overhead costs on the one hand or revenue generated by reinvestment of cash received from runoff payments on the other.

12. The government argues that Mr. Davidson's analysis should be disregarded by the Court because it appears separately from Mr. Williams's report and was not reflected in Mr. Williams's report. Hr'g Tr. at 39, 46. This argument is sophistic. Mr. Davidson was and is just as much one of Globe's expert witnesses as Mr. Williams is.

1999 lost profits may ultimately have merit, but they do not now show that Globe could not make out a case at trial. As in *California Federal*, Globe has relied upon "historical evidence of assets that it allegedly had to sell to remain in capital compliance." 245 F.3d at 1350. Those particular assets and the actual post-breach experience with those assets establish a potentially adequate foundation for post–1999 lost profits. Consequently, summary judgment must be denied respecting the post–1999 measure of lost profits.

In short, genuine issues of material fact exist regarding whether Globe's and Phoenix's claimed expectancy damages in the form of lost profits can be proved to be reasonably foreseeable, caused by the government's abrogation of its regulatory forbearances, and established with reasonable certainty.[13]

### 2. Cost of replacement capital.

■ The government contends that it is entitled to summary judgment respecting Globe's proffered use of a cost-of-replacement-capital measure of expectancy damages because Globe's proffer consists of purely hypothetical computations. Mot. at 40–42; Hr'g Tr. at 11–17. Globe and Phoenix retained Professor John J. McConnell to prepare an expert report calculating an alternative claim for damages based on the net cost of replacing the unamortized portion of Globe's capital credit and supervisory goodwill (during the remaining amortization period of 1989–2012) with tangible capital. G–App. 293 (Expert Report of Professor John J. McConnell (Nov. 5, 1999)). Professor McConnell hypothesizes that Phoenix could have issued debt securities and remitted the proceeds to Globe to restore its regulatory capital to its pre-breach level. G–App. 301.

On the facts of this case, Professor McConnell's replacement-capital model is purely hypothetical because Globe's actions to avoid seizure were entirely based on shrinking itself into capital compliance, to the point of liquidation, as described *supra*. After enactment of FIRREA, Globe never sought to raise new capital.

In numerous cases, this Court has almost uniformly rejected hypothetical cost-of-replacement-capital claims. *See Anchor Sav. Bank,* 59 Fed.Cl. at 158–60, 2003 WL 22415878 at *37–39; *Citizens Fin.,* 57 Fed.Cl. at 71–72; *Fifth Third,* 55 Fed.Cl. at 243–44; *Franklin Fed.,* 55 Fed.Cl. at 135–39; *Columbia First,* 54 Fed.Cl. at 697–700; *Bank United of Tex. FSB v. United States,* 50 Fed.Cl. 645, 654–55 (2001); *Landmark Land Co. v. United States,* 46 Fed.Cl. 261 (2000), *aff'd in part, vacated in part, rev'd in part, and remanded sub nom. Landmark Land Co. v. FDIC,* 256 F.3d 1365 (Fed.Cir.2001); *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64, 103–104 (1999), *aff'd in part, vacated in part on other grounds,* 317 F.3d 1363, 1375 (Fed.Cir.2003); *California Fed. Bank v. United States,* 43 Fed.Cl. 445, 461 (1999), *aff'd in part, vacated in part, and remanded,* 245 F.3d 1342 (Fed.Cir.2001), *cert. denied* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002) *and cert. denied sub nom. United States v. California Fed. Bank, FSB,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002); *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390, 401–02 (1999), *aff'd in part, vacated in part, and remanded,* 239 F.3d 1374 (Fed.Cir.2001). *Cf. Home Sav. of Am., FSB v. United States,* 57 Fed.Cl. 694, 728 (2003) (finding cost-of-replacement-capital model satisfied requirement of reasonable certainty because model was based on an actual, not hypothetical, stock offering). In several of these decisions, the Court explicitly rejected hypothetical models in granting summary judgment to the government. *See Anchor Bank,* 59 Fed.Cl. at 160, 2003 WL 22415878 at *39; *Citizens Fin.,* 57 Fed.Cl. at 72; *Fifth Third,* 55 Fed.Cl. at 243–44; *Columbia First,* 54 Fed.Cl. at 699; *Franklin Fed.,* 55 Fed.Cl. at 138. As the Court in *Anchor Bank* emphasized, where a thrift has chosen to meet its regulatory capital deficit

---

**13.** The government has raised no claim that Globe's actions to mitigate the breach were other than reasonable. Given the contemporaneous findings by OTS's and FDIC's examiners that Globe's actions to shrink by selling assets and deposit liabilities were "impressive," *see* G–App. 79, quoted more fully *supra*, at 91, any such mitigation claim would seemingly be unavailing on this record.

by shrinking—and seeks lost profits related to the shrinkage—its "damages can and should be based on these actual undertakings, rather than on a speculative model based on an event that never took place." 59 Fed.Cl. at 159, 2003 WL 22415878 at *38.

Globe and Phoenix counter by relying on *Southern National,* in which the Court denied the government's motion for summary judgment on a cost-of-replacement claim, finding there that plaintiffs' model was "sufficiently distinct" from purely hypothetical models. 57 Fed.Cl. at 310. In particular, the Court in *Southern National* distinguished its facts from those in *Fifth Third,* where the thrift existed in mutual form at the pertinent time and thus could not have issued stock. *Id.* at 309. The thrift in *Southern National* had converted to an equity institution prior to the FIRREA-induced breach and thus could have replaced its capital based on such an offering. *Id.* In addition, the Court in *Southern National* partially relied on an argument by claimants that their expert's model measured the diminution in value of the thrift's deposit insurance, an actual cost. *Id.* at 309–10.

Globe and Phoenix posit that their measure of damages is the net spread between Globe's deposit costs and what it *"would have* had to pay on *uninsured* funds (e.g., Wall Street capital)." Opp'n. at 40 (first emphasis added). The government responds that, however characterized, Globe's and Phoenix's replacement-capital model remains a purely hypothetical basis for determining damages and that such a model devoid of factual underpinnings has been repeatedly rejected by this Court. Reply at 23–25. The Federal Circuit in *LaSalle Talman* held that " 'the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context,' " where a plaintiff's actual experience raising capital could be used to determine cost of capital. 317 F.3d at 1374 (quoting Judge Bruggink's decision for this Court, *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64,

103 (1999)). That is not this case, and the Court therefore grants the government summary judgment on Globe's and Phoenix's alternative claim for cost of replacement capital.

### C. Incidental Damages

■ Globe's and Phoenix's final claim for damages is for actual, out-of-pocket losses allegedly caused by the government's breach. Such losses, which Globe and Phoenix term "other losses," are characterized as "incidental" damages under Section 347(b) of the Restatement Contracts. *See Restatement Contracts* § 347, cmt. c ("Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction."). *See also Williston* § 66:55–56 at 664–677. Such incidental damages are an adjunct to expectancy damages. *See supra,* at 91–92 & n. 9.[14]

Globe and Phoenix allege that they incurred actual incidental losses of $12.4 million. Opp'n. at 28. These losses consist principally of $5.8 million in prepayment penalties and early termination payments Globe paid upon liquidation of assets and matching liabilities, $4.2 million in the write-off of supervisory goodwill resulting from the acquisition of OK Federal, and $2.45 million of losses related to the Shawnee deposits. *Id.* The government argues that Globe and Phoenix have failed to prove that the liquidation-related losses of $5.8 million and Shawnee-deposit-related losses of $2.45 million were caused by the government's breach, and that the OK Federal goodwill-related losses of $4.2 million are not properly denominated as an actual loss and that any claim for those losses is foreclosed by binding precedent. Reply at 18–21.

To withstand a defendant's summary judgment motion it is not necessary for a plaintiff to "prove" the elements of its claim. The government does not seriously argue to the contrary. Rather, it makes a procedural argument. It asserts that "plaintiffs have rewritten-and materially altered-the 'other

---

14. Globe and Phoenix might also have sought recompense from such actual losses under a reliance theory had they based their claim for damages on a reliance, rather than an expectancy, ground. *See id.*

losses' component of Mr. Williams's report (and previous testimony)" and that the government "was clearly prejudiced by not being able to take discovery" respecting Globe's "new 'other losses' claim." Mot. at 37. Globe responds that it merely changed the labels on some of the losses by moving actual losses included in Mr. Williams's computation of lost profits into the "other losses" category. Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Fact ¶ 47.

This procedural argument by the government is undercut by its own briefing that shows it has not been prejudiced by Globe's shift. See Mot. at 38 ("Plaintiffs have apparently decided they would rather pursue these amounts as 'other losses' instead of 'lost profits,' as they have reduced their 'past lost profits' claim accordingly.").

Moreover, the government acknowledges that Globe has a viable claim for some incidental damages. See Hr'g. Tr. at 11 ("[I]f there's going to be a trial, we think it should be limited to those sorts of other losses, out-of-pocket expenses. And like I said, we have not said in this case that there are zero damages."). Indeed, a factual predicate exists for each actual loss claimed by Globe and Phoenix. First, Mr. Williams discusses the amounts of the prepayment penalties and early termination fees in his expert report. See G–App. 80, 88. Second, his report also explicitly addresses the losses Globe claims from the sale of its deposits and branches, G–App. 80, and his report sets out the data from which Globe derived the claimed loss of $2.45 million on the sale of the branches. G–App. 52, 78–79, 89–90. Third, Mr. Williams testified in his deposition about the write-off of supervisory goodwill resulting from the acquisition of OK Federal. P–App. 0300–01 (Tr. pp. 421–23).

The government next argues that Globe fails to prove causation with respect to the claimed loss of the $5.8 million related to Globe's sale of assets and prepayment of liabilities associated with its shrinkage or loss of the claimed $2.45 million related to the sale of the Shawnee deposits and branches. Mot. at 38–39. Regarding the liquidation expenses, the government contends that plaintiffs failed to provide evidence as to which portion of the penalties and fees paid was caused by the transactions undertaken to become capital compliant. Id. at 38; Reply at 19. Similarly, it argues that Globe and Phoenix proffered no evidence that the reduced value of Globe's deposit franchise realized upon sale to MidFirst was caused by implementation of FIRREA's capital standards. Mot. at 38–39; Reply at 19–20. Causation, however, is an issue of fact and ordinarily is not properly adjudicated on a motion for summary judgment. See, e.g., Anchor Sav., 59 Fed.Cl. at 147, 2003 WL 22415878 at *24 ("What factor and in what proportion exactly caused the sale of [the mortgage conduit company], however, need not be sorted out for the purposes of this motion, because the issue of causation is a question of fact to be determined at trial.") (citing Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1356 (Fed.Cir.2001)); Southern Cal. Edison v. United States, 58 Fed.Cl. 313, 323–24 (2003); Williston § 66:59, at 692–93.

■ Finally, with regard to Globe's and Phoenix's claim for losses of $4.2 million related to the write-off of goodwill, the government argues that goodwill cannot constitute an element of incidental damages. Reply at 20–21. See LaSalle Talman, 317 F.3d at 1376 (goodwill "not an appropriate threshold for restitution damages" because "not a usable measure of either cost to the thrift or benefit for the government"); Cal Fed, 245 F.3d at 1350–52 (restitutionary damages measured by goodwill not appropriate); Glendale, 239 F.3d at 1381–83 (restitution cannot be granted in terms of goodwill, "a special bookkeeping procedure" that reflects "at most a paper calculation."). For the same reasons that goodwill is not a viable basis for awarding restitutionary damages, it cannot be a measure for incidental damages as an adjunct to an expectancy award under Restatement Contracts § 347(b). The government is thus entitled to summary judgment on Globe's claim for $4.2 million of incidental damages resulting from the Globe's write-off of goodwill.

## CONCLUSION

For the reasons stated, it is ORDERED that the government's motion for summary

judgment on damages is granted insofar as it concerns plaintiffs' claim based upon cost of replacement capital and their claim based on the write-off of supervisory goodwill. In other respects, the government's motion is denied.

A trial on damages will be held in this case. In accordance with RCFC Appendix A, ¶ 12, the parties are directed to file a joint status report by January 28, 2004, addressing the items in ¶ 12 (last sentence) with respect to trial on damages.