**NORTHEAST SAVINGS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–550C.

United States Court of Federal Claims.

Jan. 25, 2005.

Charles J. Cooper, Cooper & Kirk, PLLC, Washington, D.C., for Plaintiff.

Tarek Sawi, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION

WILLIAMS, Judge.

This *Winstar*-related case is before the Court on cross-motions for summary judgment on liability. At issue is whether the Government entered into contracts with Plaintiff, Northeast Savings, granting Plaintiff certain favorable accounting treatment in exchange for Northeast's merging with three failing thrifts. The merger agreements, Resolutions approving the mergers, forbearance letters, and contemporaneous documentation surrounding these transactions evince the Government's agreement to permit Northeast to record supervisory goodwill as an intangible asset that could be counted toward

satisfying its regulatory capital requirements for up to 40 years. The Government breached these contracts by passing legislation prohibiting such goodwill accounting and is liable for its breach.[1]

### Background

The circumstances surrounding the thrift crisis of the early 1980s and the ensuing enactment of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) have been extensively set forth in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) and its progeny. In brief, these circumstances can be summarized as follows.

Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions (thrifts). This threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation (FSLIC), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts. *Winstar*, 518 U.S. at 846–47, 116 S.Ct. 2432.

To deal with this crisis, the Federal Home Loan Bank Board (FHLBB), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts to purchase insolvent thrifts in supervisory mergers, and would permit the acquiring institution to allocate any shortfall between liabilities and assets to an intangible asset known as "supervisory goodwill."[2] *Barron Bancshares Inc. v. United States*, 366 F.3d 1360, 1380 (2004). The FHLBB would then allow the new thrift to count supervisory goodwill toward its reserve capital requirements, and to amortize the

1. After the complaint in this case was filed, Northeast was acquired by Shawmut Bank, which was subsequently acquired by Fleet Financial Group, Inc. Fleet continues this action as Northeast's successor-in-interest. Plaintiff's Supplemental Motion for Partial Summary Judgment as to Liability at 1, n. 1 (Pl.'s Suppl. Mot.).

2. In 1981 and 1982, Generally Accepted Accounting Principles (GAAP) allowed two methods of accounting for mergers and acquisitions, either "purchase of assets" or "pooling of interest." Under the pooling method, "separate businesses are combined, and future operating results are based on the original amounts of the

respective assets and liabilities." *First Fed. Lincoln Bank v. United States*, 54 Fed.Cl. 446, 448 n. 4 (2002). The purchase method "revalues the assets and liabilities of the acquired entity from their original book value to their market value at the time of the acquisition." *Id.* At the time of these transactions, the purchase method of accounting permitted the acquiring institution to record on its books the excess of the acquired entity's liabilities over its assets on a marked-to-market basis as an intangible asset known as goodwill, or in a supervisory merger, supervisory goodwill. Faucette Aff. ¶¶ 8, 9.

goodwill over a long period of time, which frequently exceeded the life of the underlying asset.[3] *Winstar*, 518 U.S. at 849–50, 116 S.Ct. 2432. In addition, the FSLIC offered cash contributions in the form of capital credits that acquiring thrifts were permitted to count as permanent credits to regulatory capital and granted regulatory forbearances from enforcing a thrift's regulatory capital requirements for a specified period of time. *Id.* at 853, 116 S.Ct. 2432.

Nonetheless, the crisis in the savings and loan industry continued, prompting Congress to enact FIRREA, in order to prevent the collapse of the industry, to attack the causes of the crisis, and to restore public confidence. *Winstar*, 518 U.S. at 856, 116 S.Ct. 2432. FIRREA abolished the FHLBB and the FSLIC, transferred thrift insurance activities to the FDIC, established the Office of Thrift Supervision (OTS) as the new thrift regulatory agency, mandated a minimum capital requirement for thrifts and prohibited the use of supervisory goodwill. In its wake, many thrifts were unable to comply with regulatory capital requirements. *Id.* at 856–58, 116 S.Ct. 2432.

### Factual Background

In 1982, Plaintiff, Northeast Savings, F.A. (Northeast) formerly known as Schenectady Federal Savings Bank, participated in two mergers in which it merged with three failing thrifts. In the first, Schenectady Federal merged with Hartford Federal Savings and Loan Association (Hartford), and in the second, Northeast merged with Freedom Federal Savings and Loan of Worcester, MA (Freedom Federal) and First Federal Savings and Loan Association of Boston, Massachusetts (First Federal), with Northeast Savings as the resulting entity.

### The Hartford Merger

On May 11, 1982, Schenectady Savings merged with Hartford Savings and Loan Association. The post-merger association was called Northeast Savings. Affidavit of Douglas P. Faucette, in Support of Pl.'s Mot. For Partial Summ. J. (Faucette Aff.) Ex. 11, FHLBB Resolution No. 82–167. Plaintiff, Northeast Savings, entered into a written assistance agreement with the FSLIC which contained an integration clause that incorporated this FHLBB Resolution which approved the use of purchase accounting on the condition that Plaintiff (1) file a stipulation that goodwill would be determined and amortized in accordance with Bank Board Memorandum R31–b[4] and (2) an independent accountant's letter confirming the appropriateness of the use of purchase accounting under GAAP as well as the amortization period selected for the resulting goodwill. Defendant agrees that these conditions have been met and that this merger "involved a contract that permitted Northeast to include goodwill in the computation of certain capital requirements." Def. Suppl. Brief as to Liability (Def.Suppl.Br.) at 4.

### The Freedom Federal and First Federal Mergers

A few months after the completion of the Hartford acquisition, Northeast was invited by regulators to submit proposals for the acquisition of two other thrifts, Freedom Federal and First Federal. Faucette Aff. ¶ 22. Both of these thrifts had experienced severe financial difficulty, recording significant operating losses, resulting in the FSLIC's effort to find suitable merger partners for them. At the end of 1981, Freedom Federal reported assets of $797 million and liabilities of $789 million. In 1980, Freedom Federal recorded a loss of $5 million, and in 1981, it recorded a loss of $17.8 million.

---

**3.** In addition, where the amortization period for supervisory goodwill was longer than the anticipated average life of underlying loans (*e.g.,* a 40–year amortization period compared to a 20–year average life), the acquiring thrift would be able to recapture the marked-to-market discount on the acquired loans faster than it would amortize the goodwill. Thus, it would show a "gain" in the earlier years following a supervisory merger. *Winstar*, 518 U.S. at 853 n. 8, 116 S.Ct. 2432. This discrepancy was curtailed in 1983 by the promulgation of Statement of Financial Account-

ing Standards No. 72 (SFAS 72) by the Financial Accounting Standards Board. *Id.* at 855, 116 S.Ct. 2432.

**4.** Memorandum R31–b, issued by the FHLBB in September 1981, set forth FHLBB policy that GAAP would control in determining the application of purchase method accounting and the treatment of supervisory goodwill in supervisory mergers. Faucette Aff. ¶ 10 & Ex. 3.

These losses reduced Freedom Federal's net worth to $7.6 million, or less than 1 percent of its liabilities, far below the 3 percent minimum then required under FHLBB regulations. In the March 1, 1982, Report of Examination of Freedom Federal by the FHLBB, the Examiner–in–Charge found:

> The association had a net loss of $5,041,471 and $17,714,666 for the twelve month period ended December 31, 1980, and December 31, 1981 respectively.... The association lost $3,488,323 for the two month period ended February 28, 1982. Net worth has been reduced to $4,090,276 and at the present depletion rate, the institution will have zero net worth before the end of June, 1982.

Affidavit of Michael A. Carvin in Support of Pl.'s Mot. For Partial Summ. J. (Carvin Aff.) Ex. 9.

At the end of 1981, First Federal reported assets of $226 million and liabilities of $222 million. In 1981, First Federal lost $1.4 million, which reduced its net worth to $4.5 million, or 2 percent of its liabilities. Affidavit of Kirk Walters in Supp. of Pl.'s Mot. For Partial Summ. J. (Walters Aff.) ¶¶ 7, 8. First Federal received a similar report from the FHLBB Office of Examination and Supervision on March 8, 1982, regarding its financial position:

> The association lost $1,379,675 in 1981 and an additional $497,790 during the first two months of 1982. As a result of these losses, the association is unable to maintain its December 31, 1981 net worth requirement.

Carvin Aff. Ex. 10.

Northeast accepted the invitation to bid on these troubled thrifts and, on June 10, 1982, submitted a letter to the FSLIC setting out the terms and conditions of its offer to merge with both Freedom Federal and First Federal. Faucette Aff. Ex. 13. Northeast's bids were expressly premised on the allowance of the purchase method of accounting, stating:

> *Accounting*
>
> The FHLBB and FSLIC shall clear the accounting for the merger involving the Resulting Association (Northeast Savings) by the purchase method involving a loan discount accretion term of as little as 12

years and a write-off of the goodwill acquired over a period of up to 40 years in accordance with the opinion of Resulting Association's independent public accountant and subject to acceptance by the FHLBB.

*Id.*

Northeast subsequently amended its bid for Freedom Federal three times. Faucette Aff. ¶ 23. As the negotiations between the FSLIC and Northeast continued, Northeast's insistence that the regulators allow amortization of goodwill over 40 years and accretion of the discount over as little as 12 years was repeated. In a letter dated June 30, 1982, Northeast amended its proposal in the Freedom Federal merger to include a term calling for FSLIC to pay Northeast $50 million in cash or cash equivalents in exchange for Northeast's issuance of Income Capital Certificates (ICCs) to FSLIC. Faucette Aff. Ex. 15. This June 30, 1982 letter confirmed that "[a]ll other conditions to the merger and request for regulatory waivers and forbearance are unaffected by this amendment." *Id.* Northeast and First Federal executed an Agreement and Plan of Merger ("First Federal Merger Agreement") on July 12, 1982. Faucette Aff. ¶ 25 & Ex. 19. Section 1.12 of the First Federal Merger Agreement, entitled "Purchase Accounting," stated explicitly that "the merger is conditioned upon the utilization of the purchase accounting to account for the Merger." Faucette Aff. Ex. 19 at 3. Northeast's ability to use the purchase method of accounting was an express condition of the transaction.

In an August 5, 1982 letter to the FSLIC, Northeast reiterated that, in order for the First Federal transaction to move forward, the FHLBB and FSLIC had to "clear" the accounting of the mergers by the purchase method of accounting to allow Northeast to accrete the loan discount over "as little as 12 years" and amortize the goodwill "over a period of up to 40 years." Faucette Aff. Ex. 14.

By letter dated August 24, 1982, Northeast clarified its bid to acquire Freedom Federal in light of a proposed change in GAAP. Subsequent to Northeast's initial bids, the Financial Accounting Standards

Board (FASB), which promulgates GAAP, issued a draft Statement of Financial Accounting Standards No. 72 (SFAS 72), which proposed an amendment to GAAP applicable to mergers initiated after September 30, 1982, requiring that goodwill be amortized over a period "no longer than the discount on the long-term interest-bearing assets acquired is to be recognized as interest income." SFAS 72 "eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with GAAP." *Winstar*, 518 U.S. at 855, 116 S.Ct. 2432. Previously, "the proper amortization period for goodwill under GAAP was uncertain." *Id.* at 855 n. 10, 116 S.Ct. 2432.[5] In light of the proposed change in GAAP, Northeast clarified that the Freedom Federal transaction would be accounted for using the purchase method of accounting in effect on August 9, 1982, notwithstanding any subsequent change in GAAP:

> Northeast Savings is relying on the FHLBB to approve the adjustment of assets of the Resulting Association in accordance with the purchase method of accounting pursuant to the method generally accepted in the savings and loan industry on August 9, 1982. Northeast Savings also expects the FHLBB to approve the amortization of any goodwill created by such adjustment for up to a 40–year period and the accretion of any loan discount for a term to coincide with the remaining contractual life of the portfolio based on the level yield method.

Faucette Aff. Ex. 16 at 1. Alternatively, if the existing purchase method was not approved, Northeast requested more assistance:

> In lieu of such approvals, Northeast requests that the FSLIC shall in addition to the capital contribution requested pay to the Resulting Association annually for a period of 10 years the difference between earnings of the Resulting Association without such adjustment and the earnings

which would have resulted with such adjustments.

*Id.* at 2.

By letter dated September 29, 1982, Plaintiff urged the FSLIC to accelerate approval of the Freedom Federal merger to ensure that the proposed acquisition could qualify for FASB grandfathering of existing purchase accounting methodology, stating:

> Northeast has expended significant professional resources in an attempt to qualify the proposed acquisition for FASB grandfathering in order to realize the full benefits of existing purchase accounting methodology. It is anxious to achieve this result in order to be able to convert to the stock form at the earliest opportunity. Northeast has been advised by its accountants that any significant delay in completing the proposed acquisition beyond September 30, 1982 will diminish its chances of qualifying for any grandfather. Accordingly, Northeast has asked us to inform you of the need for a speedy resolution of this matter. Because of events dictated by the accounting profession and beyond the control of Northeast, it must consider substantially revising its proposal both as to the form of transaction and the total amount of the FSLIC contribution needed if favorable action is not forthcoming by October 30, 1982.

Faucette Aff. Ex. 17 at 12. Northeast also accepted the FSLIC's suggestion that its acquisition of Freedom be linked with its acquisition of First Federal stating:

> Northeast ... welcomes your suggestion that the acquisition of Freedom be linked to the acquisition of First Federal of Boston and specifically incorporates such a link in its proposal so that any approval of merger with Freedom shall be accompanied with approval of merger with First Federal of Boston. Faucette Aff. Ex. 17 at 2.

The Merger Agreement executed on September 30, 1982, by Northeast and Freedom Federal conditioned the merger upon the FLHBB's approving Northeast's use of the

---

5. SFAS 72 was issued in February 1983, and applied retroactively to transactions initiated after September 30, 1982.

purchase method of accounting "as that method was generally accepted in the savings and loan industry on July 12, 1982." Faucette Aff. Ex. 18, at 8.

On October 8, 1982, the FHLBB adopted Resolutions No. 82–679 and No. 82–680, which approved Northeast's acquisition of Freedom Federal and First Federal. Faucette Aff. ¶ 26 & Exs. 20 & 21. These resolutions both contained a section entitled "Accounting" which expressly allowed Northeast to account for the mergers according to the purchase method of accounting for regulatory purposes, in accordance with GAAP as of July 12, 1982, without reference to changes in those principles subsequently adopted by FASB. Faucette Aff. Exs. 20, at 3 & 21, at 2–3. The Resolutions expressly clarified that such definition of GAAP would apply only for purposes of the Master Agreement, the Purchase Agreement, the Certificates, the Promissory Note issued by the FSLIC in connection with the Master Agreement and the Purchase Agreement and for reports made to the Bank Board and the FSLIC—not for any other reporting obligations. *Id.* Finally, the Resolutions provided that a letter from the resulting association's independent auditors would be considered satisfactory evidence that the specified purchase method of accounting would be in accordance with GAAP. *Id.*

Two forbearance letters issued on October 8, 1982, required that Northeast submit certification by its independent public accountant that Northeast had accounted for the liabilities and assets acquired in both the First Federal and Freedom Federal mergers in accordance with pre-July 12, 1982 GAAP.

Northeast's independent accountants, Peat, Marwick, Mitchell & Co. (Peat Marwick), sent a letter to Northeast, dated October 7, 1982 [6], providing the requisite certification for the Freedom Federal merger and stated:

> You have informed us that assets and liabilities of Freedom will be recorded at their fair value at the merger date and that the difference will be allocated to goodwill and that such goodwill will be amortized on the straight-line basis over a period of 30 years. Assuming that other factors do not arise during the course of our future audits ... we will not take exception to the allocation and amortization of those amounts in reporting on the financial statements of Northeast to be produced as of the date of our examination.

Faucette Aff. Ex. 24.[7] Peat Marwick sent Northeast a similar letter on July 20, 1982,[8] stating that the purchase method of accounting was appropriate for the merger with First Federal amortizing goodwill on a straight-line basis over 30 years. Faucette Aff. Ex. 25.

During an October 8, 1982 meeting at which the assisted merger between Northeast and Freedom Federal and the unassisted merger between Northeast and First Federal were approved the Chief, Problem and Rehabilitation Division of the FSLIC stated:

> The Northeast proposal [for the acquisition of Freedom Federal], as it was finally negotiated, comes to a present value cost of $4.2 million.
>
> . . . .
>
> The alternative solutions for Freedom's problem, as we see them, were the immediate liquidation of Freedom, which would involve an immediate cash outlay of $640.8 million, and a cost to the Insurance Corporation (FSLIC) of $174.8 million. And an income maintenance for a phoenix type approach would have a present value cost of $66.9 million.[9]

6. The Court recognizes that this letter preceded the FHLBB's forbearance letter by one day.

7. Peat Marwick's Oct. 7, 1982 letter noted that FASB was considering promulgating accounting changes which would apply retroactively to transactions completed before October 7, 1982, and that, therefore, the certification was only valid for GAAP as it existed at that time. Faucette Aff. Ex. 24.

8. Like the accounting certification issued with regard to the Freedom Federal merger, this letter preceded the FHLBB's forbearance letter, in this case by almost three months, and certified that Northeast intended to account for the transaction in accordance with GAAP as it was in effect at the time the letter was issued: July 20, 1982. Faucette Aff. Ex. 25.

9. The Federal Circuit has described the "Phoenix program" as an approach devised by Government regulators to avoid the exhaustion of

Carvin Aff. Ex. 6 at 6–7. The minutes of this meeting also reflect that the regulators expressly understood that the purchase method of accounting in effect in July 1982, would apply to the Northeast transaction.[10] *Id.* at 7, 12–14.

### Income Capital Certificates

With respect to the Freedom Federal acquisition, FSLIC and FHLBB promised to provide Northeast assistance in the form of a FLSIC $50 million promissory note in return for an ICC in like amount and cash equal to the negative net worth of Freedom Federal as of October 8, 1982. Faucette Aff. ¶ 29. Freedom Federal's negative net worth as of that date was subsequently calculated to be $12.8 million, which FSLIC paid to Northeast in accordance with the agreement. *Id.* With respect to the ICC transaction, Northeast and FSLIC executed a Master Agreement. The Agreement specifically provided that the amount of outstanding [ICCs] would qualify fully toward meeting the net worth and reserve requirements of [Northeast] pursuant to [FHLBB's and FSLIC's regulatory capital requirements] or any successor requirements. *Id.* ¶ 29, and Ex. 26.

The Master Agreement limited its scope to the FSLIC's purchase of the ICC's as follows:

> This Master Agreement, the Certificates and the Purchase Agreement embody the entire agreement between the parties regarding the purchase by FSLIC of Income Capital Certificates issued by the Association [Northeast] and FSLIC assistance to the Association and supersede all prior agreements and understandings relating to such a purchase or assistance, but do not supersede any other agreement between the FSLIC and the Association not direct-

ly contradicted by the Master Agreement and the Purchase Agreement.

Faucette Aff. Ex. 26 ¶ 60.

### Treatment of the Resulting Supervisory Goodwill

After both transactions were consummated and the assets and liabilities of First Federal and Freedom Federal were marked to market, the amount by which the liabilities exceeded the assets of the two thrifts was recorded on the resulting institution Northeast's books, as an intangible asset, supervisory goodwill. The amount of supervisory goodwill recorded by Northeast was $163,330,000 as a result of the Freedom Federal merger and $17,738,000 as a result of the First Federal merger, to be amortized over 30 years. Walters Aff. ¶ 10. Subsequent to the merger, in reports filed with the FSLIC and FHLBB "Northeast [ ] consistently booked this supervisory goodwill as an asset included in capital for regulatory purposes, and neither FSLIC nor FHLBB [ ] ever objected to Northeast's treatment of supervisory goodwill." *Id.*

### The Passage of FIRREA

On August 9, 1989, FIRREA became effective. The legislation abolished the FHLBB, created the OTS, and instructed the OTS to promulgate regulations creating strict capital standards which did not allow intangibles such as goodwill to be counted as capital for regulatory purposes. The OTS promulgated regulations on December 7, 1989, that prohibited Northeast from treating the supervisory goodwill from the three mergers as an asset for the purpose of meeting regulatory capital requirements. As a result of OTS's application of FIRREA and its capital regulations, Northeast fell out of compliance with the OTS capital requirements as of December 31, 1989. Rutland Aff. ¶¶ 5 and 7.

FSLIC funds, explaining that the consolidation of several failing thrifts into a single association would not only achieve efficiencies and receive close regulatory oversight, but would also receive significant assistance from the government, including monetary contributions, regulatory forbearances, and authorization to use a purchase accounting system. *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1367 (Fed.Cir. 2003).

10. The regulators discussed Northeast's acquisitions of both Freedom Federal and First Federal, and the minutes reflect discussion of both, but do not discuss purchase accounting separately for each of the acquired thrifts. The minutes instead generally state that "Northeast has requested the use of purchase accounting." Carvin Aff. Ex. 6 at 12.

## Discussion

### Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making a determination as to whether summary judgment is appropriate, a court does not weigh the evidence to determine the truth of the matter, but rather whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. The movant bears the initial burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact finder to decide the case in its favor. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. If such evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505. When considering the existence of a genuine issue of material fact, a court must draw all inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When considering cross-motions for summary judgment, the court evaluates each motion under the same standard. *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999). Issues of contract interpretation are appropriate for summary judgment. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996); *see also La Gloria Oil and Gas Co. v. United States,* 56 Fed.Cl. 211, 213 (2003). If genuine disputes exist over material facts, both motions must be denied. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987).

Courts must act with caution in granting summary judgment, because though it is a useful procedural tool to speed the determination of disputes in which no questions of material fact exist, an erroneous grant of summary judgment may deny a party its chance to prove its case at trial. *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146–47 (Fed.Cir.1983). Likewise, an "improvident denial" of summary judgment may force the parties and the court to bear the expense of an unnecessary trial. *Id.*

### The Hartford Acquisition

With respect to the Hartford acquisition, Defendant agrees that "under applicable case law the Schenectady transaction involved a contract that permitted Northeast to include goodwill in the computation of certain capital requirements." Def.'s Suppl. Mot. at 3–4. Moreover, Defendant conceded in its Response to Plaintiff's Proposed Order dated April 30, 1998, that pursuant to *Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1347–48 (Fed.Cir.2001), "a contract was formed with respect to the Schenectady transaction involved in this case," and "the enforcement of FIRREA was inconsistent with the terms of that contract." Pl.'s Resp. to Prop. Order at 4 n. 2. This Court agrees.

### Freedom Federal and First Federal [11]

#### The Elements of a Contract Existed in Northeast's Acquisitions of Both Failing Thrifts

■ In cases in which the Government contracts as a commercial party, courts are to apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar,* 518 U.S. at 871, 116 S.Ct. 2432. When contracting with the Federal Government, those elements of contract formation are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and

11. Both transactions at issue here involved substantively identical documentary evidence, other than the ICC Master Agreement which only applied to Freedom Federal. Thus, for purposes of these cross-motions for summary judgment, this Court will treat the Freedom Federal and First Federal transactions in tandem. Defendant contends that, unlike the Freedom Federal transaction, the First Federal transaction "involved no

executed agreement between Northeast and the Government." Def.'s Suppl. Mot. at 4. However, the referenced executed agreement, the Master Agreement for Income Capital Certificates, is not the supervisory goodwill contract Northeast seeks to enforce here and does not alter the parties' agreements embodied in the merger agreements, correspondence, and Resolutions, which address goodwill accounting.

acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed.Cir.2003); *Total Medical Management, Inc. v. United States*, 104 F.3d 1314 (Fed.Cir.1997).

### Mutuality of Intent to Contract—Lack of Ambiguity in Offer and Acceptance

■ Unambiguous mutuality of intent to contract is a precondition for contract formation. *Anderson*, 344 F.3d at 1353; *Fifth Third Bank of Western Ohio v. United States*, 52 Fed.Cl. 264, 270 (2002). In order to show that mutual intent existed, a plaintiff must provide objective evidence of an offer and a reciprocal acceptance. *Anderson*, 344 F.3d at 1353.

### Offer

■ "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Anderson*, 344 F.3d at 1353; *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1051 (Fed.Cir.2001) (quoting Restatement (Second) of Contracts § 24); *Franklin Sav. Corp. v. United States*, 56 Fed.Cl. 720, 742–43 (2003). In this case, Northeast made an offer to the Government to acquire Freedom Federal and First Federal in exchange for, *inter alia*, the ability to amortize supervisory goodwill over an extended period of time—up to 40 years coupled with the use of the shorter loan discount accretion schedules. Northeast made those offers in response to the regulators' invitations that it acquire these seriously troubled thrifts.

The proposal letters sent by Plaintiff to the FSLIC on June 10, 1982 (the Freedom Federal letter), and August 5, 1982 (the First Federal letter), contained identical language specifying Northeast's requirements from FHLBB in order for the transactions to proceed:

> [The regulators] shall clear the accounting for the merger ... by the purchase method of accounting involving a loan discount accretion term of as little as 12 years and a write-off of the goodwill acquired over a period of up to 40 years in accordance with the opinion of Resulting Association's independent public accountant and subject to acceptance by the FHLBB.

Faucette Aff. Exs. 13 and 14.

Cognizant of a proposed change in GAAP in August of 1982, requiring that goodwill be amortized over a period substantially shorter than 40 years, Northeast ensured that its offers were premised upon GAAP previously in effect, reiterating its original requirement that the FHLBB approve the longer amortization period and shorter loan discount accretion term, notwithstanding any change in GAAP. In its August 24, 1982, letter regarding the Freedom Federal merger, Northeast emphasized that it was "relying" on FHLBB's approval of the merger under the former GAAP notwithstanding any change in GAAP. Faucette Aff. Ex. 16. In its letter of September 29, 1982, Plaintiff urged that the FSLIC accelerate approval of the Freedom Federal merger so as to qualify for FASB grandfathering "in order to realize the full benefits of existing purchase accounting methodology." In that same letter Northeast "specifically incorporated" a link of the acquisitions of Freedom and First Federal "in its proposal so that any approval of merger with Freedom [would] be accompanied with approval of merger with First Federal of Boston." Faucette Aff. Ex. 17 at 2. Thus, Northeast's offer for both transactions embodied purchase accounting under existing GAAP prior to the change in SFAS 72.

What clearly emerges and never changed during the negotiations and iterations of Plaintiff's offer was Northeast's requirement that in exchange for acquiring the financially ailing thrifts, the regulators allow long-term amortization of regulatory goodwill and a shorter loan discount accretion term irrespective of any subsequent change in GAAP preventing this treatment. There is no question of Northeast's willingness to enter the bargain on these terms. As in *Anderson*, this particular accounting treatment was a condition of both Northeast's offers. *Anderson*, 344 F.3d at 1354. Finally, Northeast's responses to the Government's invitation to bid on these troubled thrifts—its offer letters and ensuing correspondence were suf-

ficiently definite to constitute contractual offers. *See Am. Fed. Bank, FSB v. United States,* 62 Fed.Cl. 185 (2004).

### *Acceptance*

"For a contract to be formed once an offer is made, there must be an acceptance, *i.e.,* a 'manifestation of assent' to the terms thereof made by the offeree in a manner invited or required by the terms of the offer." *Anderson,* 344 F.3d at 1355 (*quoting* Restatement § 50(1)). In *D & N Bank,* the Federal Circuit held that in the *Winstar* context, "something more" than mere regulatory approval of the merger is necessary to support a finding that the Government accepted an offer and entered into a contractually binding agreement. *D & N Bank v. United States,* 331 F.3d 1374, 1379 (Fed.Cir. 2003). In *Anderson,* the Federal Circuit illuminated what that "something more" might be, stating that it "must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.'" *Anderson,* 344 F.3d at 1356 (*quoting* Restatement (Second) of Contracts § 50 cmt. a.). Here, the regulators approved the mergers in resolutions allowing Northeast to do precisely what it had offered—use the purchase method of accounting in effect prior to the change in GAAP to amortize substantial amounts of goodwill over an extended period. The Government's Resolutions approving the mergers and forbearance letters reflecting this accounting treatment constituted an acceptance of Plaintiff's offer.

Defendant's reliance on *D & N* to suggest that no contract was formed is misplaced. In *D & N,* the Court found that mere approval of a merger did not amount to intent to contract because "[t]he Bank Board, in its regulatory capacity, must approve all mergers." *D & N,* 331 F.3d at 1378. Importantly, the *D & N* resolution did not mention goodwill, and goodwill was not negotiated—D & N simply submitted the application to the Bank Board, and it was approved. *Id.* Unlike *D & N,* in this case there are numerous indicia that the long-term amortization of

supervisory goodwill was bargained for by Northeast and the FHLBB.

The Government expressly agreed to allow Northeast to use the purchase method of accounting in effect "as of July 12, 1982" in both Resolution No. 82–679 and Resolution No. 82–680, and this was acknowledged by the regulators in their meeting approving these mergers as reflected in the minutes. Further, the Director of the FSLIC at the time testified in his deposition that the Government would not have recommended approval of the Freedom Federal and First Federal mergers, absent the goodwill accounting. Beesley Dep. at 45–46, Pl's Suppl. Mot. Ex. B at 12–13. Again, in forbearance letters issued on October 8, 1982, the FHLBB clearly expressed its agreement that the mergers were to be accounted for using the purchase method of accounting, conditioned upon a certification by Northeast's independent accountants that such accounting treatment conformed with GAAP. Such certifications were received from Peat Marwick and specified that the amortization period for the resulting goodwill would be 30 years.

In *La Van v. United States,* 382 F.3d 1340 (Fed.Cir.2004), the Federal Circuit found that the FHLBB's resolution approving the merger coupled with an internal memorandum signaled "something more" than mere regulatory approval. The Court noted that the internal memorandum reflected that the parties had negotiated at arms length for the treatment of goodwill and that the treatment of goodwill was at the "epicenter" of the conversion process. Here, Northeast's ability to use the purchase method of accounting according to GAAP in effect prior to the change in SFAS 72 was likewise at the epicenter of the transaction, as reflected in the Resolution, the minutes of the meeting approving the mergers, the forbearance letters and the accountants' approval letters. Moreover, the documents detailing the parties' agreement indicate that this treatment of goodwill was negotiated, not rubber stamped by the regulators.[12]

*Bancshares* does not preclude the Court's consideration of documentation reflecting the intention of the parties, like that in *La Van, Cal. Fed.* and

---

12. The Federal Circuit's prohibition against parole evidence to modify, supplement or alter the terms of an integrated agreement in *Barron*

Plaintiff's request for acceleration on September 29 to "realize the full benefits of existing purchase accounting" was met with acceleration and express recognition by the regulators in the Resolution and forbearance letters, that this existing purchase accounting treatment would in fact be grandfathered in the Northeast merger subject to the certification of the auditors. In *Ambase Corp. v. United States*, 58 Fed.Cl. 32 (2003), the plaintiff was similarly faced with the impending passage of SFAS 72 during merger negotiations and proposed an alternative to its request that the FHLBB allow the resulting institution to amortize goodwill over 40 years notwithstanding any change in GAAP. The *Ambase* Court explained the significance of this alternative:

> If the FHLBB was unwilling to agree to these terms [regarding the goodwill], Carteret alternatively proposed "that the FSLIC pay to the Resulting Association annually for a period of 10 years the difference between earnings of the Resulting Association without such adjustment and the earnings which would have resulted with such adjustments." Therefore, Carteret offered the FHLBB a choice between a cash payment or certain accounting treatment, and the FHLBB chose the latter.

*Ambase*, 58 Fed.Cl. at 43–44 (citations omitted). In its September 29 letter, Northeast proposed the identical alternative as the plaintiff in *Ambase*. Just as in *Ambase*, Defendant here, when faced with the option of contributing an additional large sum of money to Plaintiff or allowing its requested accounting treatment, chose the latter.[13]

Further, Northeast initially sought FHLBB's agreement to permit it to account for the acquisition under the purchase method not only for purposes of reporting to the FHLBB, but also for reporting to "its customers, creditors, depositors, security holders or the public." Faucette Aff. Ex. 16 at 1. However, the FHLBB only agreed to be bound to Northeast's proposal regarding *regulatory* reporting, noted Northeast's agreement "to delete any request for such treatment for any public reporting purpose" and reflected this agreement in both Resolutions. Carvin Aff. Ex. 7 at 5; Faucette Aff. Exs. 20 and 21. The Government's acceptance of Northeast's offer on different, narrower terms,—allowing purchase accounting for regulatory purposes, but not public reporting—was clear, and this alteration to Northeast's offer was the bargain it accepted.[14]

### Consideration

In the *Winstar* context, the consideration necessary for contract formation involves the Government providing economic inducements such as goodwill and capital credits to relatively healthy thrifts in exchange for their merging with troubled thrifts. The Government avoids the expense of bailing out the troubled thrifts temporarily and the acquiring thrift receives the goodwill to be counted toward capital requirements. *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432. As one court put it, "the action taken by the purchasing [institution] in acquiring the failing thrift did not result in the Government ... saving the dollar value of the net obligations of the

---

*Ambase* to ascertain the existence of a contract and its terms.

13. *Ambase* is remarkably similar to the instant case—factors which led the *Ambase* Court to conclude that the FHLBB entered into contracts permitting Plaintiff to use the purchase method of accounting are present here—the reference to this accounting in the merger agreements, the thorough negotiations, the express reference to purchase accounting in the Resolutions, forbearance letter and assistance agreement, the unstable condition of the target thrifts at the time of the mergers and the lack of a reason for Plaintiff's entering into the mergers absent such goodwill accounting.

14. The fact that Plaintiff requested that it be allowed to account for the transaction pursuant to GAAP in effect on August 9, 1982, and Defendant, in the FHLBB resolutions, agreed that GAAP, as it was in effect on July 12, 1982, would apply to the transactions is immaterial. As pertinent GAAP did not change between July 12, 1982 and August 9, 1982, this difference in the dates does not constitute a varying term and does not render the Resolutions counteroffers. Plaintiff asked to apply GAAP in effect in August 1982 so it could use the purchase method of accounting and the merged institution could amortize the goodwill acquired over a period of up to 40 years. The Government assented to this term by providing that the same version of GAAP, in effect at a date earlier than Plaintiff had requested, would apply.

thrift.... In a very real sense, what the Government received in exchange for its promise was time." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1382 (Fed.Cir.2001); *see also Am. Fed. Bank, FSB v. United States,* 58 Fed.Cl. 429, 444–45 (2003).

Such consideration was clearly exchanged here. Both Freedom Federal and First Federal were experiencing severe financial difficulty. In exchange for Northeast's merging with these thrifts, the regulators provided financial inducements including extended amortization of supervisory goodwill notwithstanding the imminent adoption of an accounting standard which prohibited such treatment retroactively. Moreover, in the case of Freedom Federal, the Government also provided Northeast with $50,000,000 in assistance by a purchase of ICCs. Just as in *Cal. Fed.,* "[b]ased on all of the contemporaneous documents in each of the ... transactions, the FHLBB and FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters," and the resolutions they incorporated. *Cal. Fed.,* 245 F.3d at 1347. Consideration was, therefore, clearly bargained for and exchanged.

### A Government Representative Had Actual Authority to Bind the United States in Contract

For a plaintiff to prove that the Government is contractually bound, it must show that the parties which purported to bind the Government had actual authority to do so. *Commercial Fed. Corp. v. United States,* 55 Fed.Cl. 595, 616 (2003); *Am. Fed. Bank, FSB,* 58 Fed.Cl. 429 (2003). In the *Winstar* context, it has long been settled that the FHLBB had authority to bind the Government. As the Federal Circuit stated:

We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative. *Id.[, Winstar Corp. v. United States,* 64 F.3d 1531] at 1548 [(Fed.Cir.1995)]. Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. *Id.* Further, both the FSLIC and its supervisory agency, the FHLBB, have had "the

authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed)." *Id.*

*Cal. Fed.,* 245 F.3d at 1347–48.

### Defendant's "One Contract" Argument

Defendant argues that because the only bilateral contract in this transaction does not mention goodwill, no contract for goodwill can exist. In *Cal. Fed.* our appellate authority squarely rejected the argument that all the contractual provisions in these types of transactions must be contained in a single document stating:

We agree with the Court of Federal Claims that "[i]f the factual record of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed."

*Cal. Fed.,* 245 F.3d 1342, 1347 (Fed.Cir.2001) (*quoting Cal. Fed. Bank, FSB v. United States,* 39 Fed.Cl. 753, 773 (1997)).

In addition, the document upon which the Government relies, the "Master Agreement for Issuance of ICCs" does not purport to be an agreement establishing the treatment of supervisory goodwill Plaintiff is alleging here. The "Master Agreement for Issuance of ICCs" is limited in scope to the ICCs and did not supersede any agreement between the FSLIC and Northeast "*unless it was directly contradicted by the Master Agreement and the Purchase Agreement.*" No language in the Master Agreement contradicts the agreement to allow for long-term amortization of supervisory goodwill.

### The Breach

■ When the law as to minimum capital requirements changed, "the Government was unable to perform its promise and, therefore, became liable for breach." *Winstar,* 518 U.S. at 870, 116 S.Ct. 2432; *Am. Fed. Bank, F.S.B. v. United States,* 58 Fed.Cl. 429, 445–

46 (2003). With the enactment of FIRREA, Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of 12 U.S.C. and 26 U.S.C.), the OTS developed new minimum capital requirements, which were applied to Northeast in December 1989. In the instant case, the Government acknowledges that there was a change in rules that required Northeast to phase out goodwill. *See* Def.'s Resp. to Pl.'s Suppl. Mot. As in *Winstar*, the Government breached its contract with Northeast when it began to enforce new minimum capital requirements in accordance with FIRREA.

### Conclusion

Plaintiff's motion for partial summary judgment with regard to the Government's liability is **GRANTED**. Defendant's cross-motion for summary judgment on liability is **DENIED**. The Court will conduct a status conference in Chambers, U.S. Court of Federal Claims, 717 Madison Place, Suite 612, Washington, DC on February 7, 2005, at 2:30 p.m. to discuss further proceedings on the issue of damages.