**NORTHEAST SAVINGS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–550C.

United States Court of Federal Claims.

July 18, 2006.

Charles J. Cooper, Vincent J. Colatriano, David H. Thompson, Cooper & Kirk, PLLC, Washington, D.C., for Plaintiff.

Tarek Sawi, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON DAMAGES

WILLIAMS, Judge.

This *Winstar*-related case comes before the Court on Defendant's Motion for Summary Judgment Upon Damages. Plaintiff seeks three elements of damages: 1) lost profits; 2) cost of raising additional capital; and 3) out-of-pocket expenses related to the breach. Defendant argues each of these damages theories fails as a matter of law. Because material facts are in dispute and the conflicting expert opinions cannot be resolved on this record, Defendant's Motion for Summary Judgment is denied.

### Background[1]

In 1982, Plaintiff, Northeast Savings, F.A. (Northeast) formerly known as Schenectady Federal Savings Bank merged with three failing thrifts in two separate transactions. In the first transaction, on May 11, 1982, Schenectady Savings merged with Hartford Savings and Loan Association (Hartford) and became Northeast. A few months later, the regulators invited Northeast to submit proposals for the acquisitions of Freedom Federal Savings and Loan (Freedom Federal) and First Federal Savings and Loan (First Federal). Northeast bid on both ailing thrifts and negotiations ensued resulting in the merger of Northeast with Freedom Federal and First Federal.

In its decision on Summary Judgment on Liability, this Court found that "[t]he merger agreements, Resolutions approving the mergers, forbearance letters, and contemporaneous documentation surrounding [the] transactions evince[d] the Government's agreement to permit Northeast to record supervisory goodwill as an intangible asset that could be counted toward satisfying its regulatory capital requirements for up to 40 years." *Northeast Sav. v. United States*, 63 Fed.Cl. 507, 508 (2005). As such, this Court found that a contract had been formed between Northeast and the Government which was breached by the passage of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA).

Following Northeast's acquisitions of Freedom Federal and First Federal, Northeast recorded over $290 million in supervisory goodwill. Northeast Savings 1984 Annual Report at 214118, Appendix to Plaintiff's Opposition to Defendant's Motion for Summary Judgment on Damages (Pl.App.) 4. Northeast booked this supervisory goodwill as an asset included in capital for regulatory purposes in reports it filed with the Federal Savings and Loan Insurance corporation (FSLIC) and Federal Home Loan Bank Board (FHLBB), and neither regulator objected. *Northeast*, 63 Fed.Cl. at 513.

On August 9, 1989, FIRREA came into effect. The legislation abolished the FHLBB, created the Office of Thrift Supervision (OTS) and directed OTS to promulgate new regulations which did not allow goodwill to be counted as capital. These regulations were effective as of December 7, 1989. As a result of the new regulations, Northeast fell out of capital compliance as of December 31, 1989. *Northeast*, 63 Fed.Cl. at 513.

1. This background is derived from *Northeast Sav. v. United States,* 63 Fed.Cl. 507 (2005), as well as the filings and appendices regarding summary judgment on damages. A general knowledge of the savings and loan crisis leading to the *Winstar* litigation is assumed.

As of June 30, 1989, Northeast reported to the FHLBB that it had approximately $208 million of goodwill remaining on its books. *See* June 30, 1989 FHLBB Thrift Financial Report, Pl.App. 91. According to its Securities and Exchange Commission quarterly reports in the summer and fall of 1989, Northeast began to reduce its asset size "in anticipation of the new capital regulations which [were] being promulgated by the Office of Thrift Supervision in accordance with FIRREA." Northeast Savings' Form 10-Q (Sept. 30,1989), Pl.App. 240.[2] As of September 30, 1989, Northeast had reduced its asset size from approximately $8 billion to $6.3 billion. Dec.1988 Business Plan, Pl.App. 142 (showing assets of $8.14 billion as of December 1988); Northeast Savings' Form 10-Q (Sept. 30, 1989), Pl.App. 240 (stating that Northeast had reduced its asset size to $6.3 billion).

In March 1990, Northeast wrote off approximately $109.4 million in goodwill. 1990 Annual Report, Appendix to Defendant's Motion for Summary Judgment upon Damages (Def.App.) 2448. From 1990 through 1993, Northeast continued to shrink its asset base. Expert Report of Dr. Nevins D. Baxter (Baxter Rep.), Ex. 3, Pl.App. 44. By September 1990, Northeast reduced its assets to $4.974 billion. Sept.1990 Form 10-Q, Def.App. 1290. In September 1991, Northeast's assets were $3.984 billion. Sept.1991 Form 10-Q, Def.App. 1391. By December 1992 Northeast's total assets were $3.91 billion. 1992 10K, Def.App. 843. At the end of 1992, Northeast wrote off its remaining goodwill—approximately $56.6 million. *See* 1992 10K, Def.App. 825.

In early 1992, Northeast acquired seven branches from the Rhode Island Depositors Economic Protection Corporation (DEPCO). Northeast 1992 Annual Report, Def.App. 2589, 2535. In order to complete this acquisition, Northeast raised capital by issuing preferred stock and warrants to DEPCO. *Id.*

In June 1995, after the complaint in this case was filed, Northeast was acquired by Shawmut Bank. Baxter Rep. ¶ 32, Pl.App. 24. Shawmut was subsequently acquired by Fleet Financial Group, Inc., and Fleet continues this action as Northeast's successor-in-interest. Plaintiff's Supplemental Motion for Partial Summary Judgment as to Liability at 1 n. 1.

### Experts

The parties have retained four experts in this litigation. Northeast has retained the services of Dr. Nevins D. Baxter, a consultant to banks and thrifts concerning regulatory, financial and strategic matters, to prepare a report of the sources and amounts of damages Northeast suffered as a result of the breach of contract. Baxter Rep., Pl.App. 13–73. The Government has retained three experts: Daniel R. Fischel, W. Barefoot Bankhead and Dr. Anjan V. Thakor. Mr. Fischel is Director, Chairman and President of a consulting firm specializing in the application of economics to legal and regulatory issues. Mr. Fischel's report addresses Dr. Baxter's damages models as a whole and offers multiple criticisms. Expert Report of Daniel Fischel (Fischel Rep.), Def.App. 127–238. Mr. Bankhead is a director with a consulting firm and a certified public accountant. Mr. Bankhead's report also addresses Dr. Baxter's analysis, in particular, Northeast's accounting for its goodwill before and after FIRREA. Expert Report of W. Barefoot Bankhead (Bankhead Rep.), Def. App. 62–126. Dr. Thakor is a professor of finance at the John M. Olin School of Business, Washington University. Dr. Thakor was retained to examine the damages claims by Plaintiff based on the "conceptual and factual foundations of the economics underlying the damage calculations." Expert Report of Dr. Anjan Thakor (Thakor Rep.), Def.App. 239–313.

### Discussion

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rules of the United States Court of Federal Claims (RCFC) 56(c); *see also Anderson v. Liberty*

---

2. Northeast stated in its September 30, 1989 Form 10-Q that the new regulations would require savings institutions "to maintain a ratio of core capital to assets of not less than 3%," and goodwill would be counted only up to a level equal to 1.5% of assets. Pl.App. 246.

*Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making such a determination, the Court does not weigh the evidence to determine the truth of the matter, but rather determines whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. The movant bears the initial burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no genuine issue of material fact if a rational fact-finder could reach only one reasonable conclusion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Globe Sav. Bank, F.S.B. v. United States,* 59 Fed.Cl. 86, 91 (2003). The nonmovant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact-finder to decide the case in its favor. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. If such evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505. When considering the existence of a genuine issue of material fact, a court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### Northeast's Goodwill

Plaintiff argues that, without the breach, Northeast would have been able to utilize goodwill to meet the new capital requirements without the need for further asset shrinkage which hindered its economies of scale and profits. Plaintiff's Opposition to Motion for Summary Judgment (Pl.Opp.) 19. Defendant argues that Plaintiff has "grossly overstated" the amount of goodwill Northeast would have been entitled to include on its books after FIRREA. Defendant contends that the contract required the applica-

tion of GAAP under which Northeast was required to write off all of its goodwill by 1992, for reasons unrelated to the breach. Defendant urges the Court to reject all of Northeast's damage claims because they assume excessive goodwill, and diminishing the amount of goodwill assumed would negate all of Plaintiff's theories. Defendant's Motion for Summary Judgment Upon Damages (Def.Mot.) 2.

Defendant cites Northeast's public disclosures to argue that goodwill was necessarily written off for reasons other than the breach. For example, Defendant points to a March 1990 press release in which Northeast stated that the value of its Massachusetts and Connecticut franchises were diminished by the passage of the Connecticut Interstate Banking law and required a write-off of goodwill. Press Release, Def.App. 3485–89; see 1990 Annual Report, Def.App. 02448.[3] According to Defendant's accounting expert, the March 1990 write-off of goodwill was not related to FIRREA's phase-out of supervisory goodwill toward capital requirements. Bankhead Rep. ¶¶ 19–22, Def.App. 70–72. Defendant also argues that Northeast's 1992 write-off of $56 million of its goodwill proves that it was writing off goodwill according to GAAP and not in light of FIRREA because FIRREA's phase-out schedule would have allowed Northeast to include $38 million in goodwill toward capital requirements as of 1992. Def. Mot. 32; Bankhead Rep. ¶ 21, Def.App. 71.

Plaintiff argues that it would not have written off the supervisory goodwill absent the breach. Plaintiff points to a report from Kaplan Smith[4] to argue that "[t]he primary factor [behind the 1990 write-off of goodwill] was the impact of regulations promulgated by the Office of Thrift Supervision ... pursuant to FIRREA that require the deduction of a substantial portion of goodwill in calculat-

---

**3.** The Press Release stated that Northeast had "analyzed the value of its remaining goodwill and voluntarily reduced supervisory goodwill by $109.4 million," due to numerous "regulatory and legislative actions which reduced the value of the company's Connecticut and Massachusetts franchises, including the passage of the Connecticut Interstate Banking Law; the passage of FIRREA by Congress and the associated OTS regulations which require a deduction from regulatory

capital of supervisory goodwill; and the deteriorating condition of the banking industry in New England." Press Release, Def.App. 3485–89.

**4.** Kaplan Smith is described by Plaintiff as a "leading thrift consulting firm." Pl. Opp. 7. Kaplan Smith was hired by Plaintiff in 1988 to "undertake a comprehensive examination of all the strategic options available to Northeast." *Id.*

ing regulatory capital." 1992 Kaplan Smith Report, Pl.App. 406.[5]

In sum, the reasons which caused Northeast to write off its goodwill are vigorously disputed and cannot be determined on summary judgment.

### Damages

Plaintiff claims damages in three measures: lost profits, the cost of raising additional capital and out-of-pocket expenses related to the breach. Pl. Opp. 19–22; Baxter Rep., Pl.App. 14–15.[6]

As the parties recognize, these components of Plaintiff's claimed damages—lost profits, the cost of raising additional capital and out-of-pocket expenses—fall under the rubric of expectancy damages. These theories represent the benefits Northeast could have expected, both in terms of profits earned and expenses not incurred, absent the breach. As the Federal Circuit has recognized, "[o]ne way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981)). The purpose of expectancy damages is to put the non-breaching party "in as good a position as he would have been in had the contract been performed." Restatement (Second) Contracts § 344(a) (1981); *see also Glendale*, 239 F.3d at 1380. Lost profits are often the measure of expectancy damages, though other damages, including incidental losses may also be included. *Glendale*, 239 F.3d at 1380. "Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction." Restatement (Second) Contracts § 347 cmt. c.

■ A plaintiff is entitled to recover expectancy damages upon a showing by a preponderance of the evidence that:

(1) the loss was the proximate result of the breach;

(2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and

(3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed.Cir.2002) (citations omitted).

### Lost Profits

■ In *California Fed. Bank, FSB v. United States*, the Federal Circuit vacated summary judgment in favor of the government on a lost profits claim holding that "[b]oth the existence of lost profits and their quantum are factual matters that should not

---

**5.** Plaintiff also argues that the diminished values of its branches, which precipitated the write-offs of goodwill in 1990 and 1992, were a result of losses in economies of scale and profits occasioned by the need to sell off assets as a result of FIRREA. Pl. Mot. 14–19. Plaintiff points out that the Government knew the loss of assets would result in decreased economies of scale and depressed earnings. Nov. 6, 1991 FDIC Baseline Review Form, Pl.App. 396 ("Decreased economies of scale resulting from rapid shrinkage of the institution along with large provision expenses necessitated by loan losses have contributed to restricting the improvement of overall earnings."); May 24, 1991 Government Interoffice Memorandum from J. Winning to M. Simone and J. Burke, Pl.App. 390 (asset shrinkage would "depress earnings"). According to Plaintiff, without FIRREA, it would have never been forced to sell off the assets, leading to the diminished values of the franchises and the write-off of goodwill. *See* June 15, 1990 Northeast Savings

Three Year Business Plan, Pl.App. 308–09 ("The legislatively mandated exclusion of supervisory goodwill from capital reduces the capital available to the Association to leverage and thereby diminishes the value of the goodwill asset—all of which is associated with Northeast's acquisition of its Massachusetts and Connecticut franchises through supervisory mergers.").

**6.** Dr. Baxter's report also provides an alternative calculation "on the basis of valuing the regulatory capital that was lost by Northeast as a direct consequence of the Government's breach." Baxter Rep. ¶ 6, Pl.App. 15. In the face of Defendant's argument that this theory was hypothetical and too speculative for trial, Plaintiff stated that this calculation was only to show the reasonableness of the course of action that Northeast took, and was not a damages theory. Pl. Opp. 11, n. 6.

be decided on summary judgment if material facts are in dispute." 245 F.3d 1342, 1350 (Fed.Cir.2001) *(CalFed I)* (citation omitted). In *CalFed I,* the plaintiff had "offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period and historical evidence of assets that it allegedly had to sell to remain in capital compliance." *Id.* This evidence, along with expert testimony, "more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits." *Id.* This Court has recognized that after *CalFed I,* a case "would be the rara avis, indeed that would merit summary judgment [on lost profits]." *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223, 236 (2003) (noting that "[a] court never errs by declining to grant summary judgment when the better, or more prudent, course is to proceed to trial").

Plaintiff contends that the Government's breach caused Northeast to incur damages of $112.352 million in lost profits. Baxter Rep. ¶ 51, Pl.App. 32. These damages represent profits that Dr. Baxter concludes Northeast would have made had it been able to remain its pre-breach size after FIRREA. According to Dr. Baxter, however, FIRREA forced Northeast to sell off over $4 billion in assets which reduced its size and made it less profitable.

Dr. Baxter calculates lost profits on Northeast's foregone assets, *i.e.,* those assets Northeast would have held to maintain its size absent the breach, and on the divested assets actually sold to accomplish the shrink. Dr. Baxter measures lost profits on the foregone assets by determining the foregone assets for each quarter and multiplying this figure by the spread on the those assets. Baxter Rep. ¶ 41, Pl.App. 28.[7] Dr. Baxter

calculates the foregone assets for each period as "the difference between the tangible assets of the actual bank, and the tangible assets of the but-for bank." *Id.;* Baxter Rep. Ex. 6, Pl.App. 48–49. Dr. Baxter calculates the spread on the foregone assets as "the difference between the weighted average interest rate earned on wholesale assets and the cost of wholesale liabilities in each period for the actual bank." Baxter Rep. ¶ 42, Pl.App. 28–29.[8] Dr. Baxter takes the net gains from purchased loans[9] that were sold as part of the asset shrinkage, as well as the net gains associated with the sale of mortgage-backed securities (MBS), as an offset to the lost profits calculation for the foregone assets. *Id.* ¶¶ 48–50, Pl.App. 31–32. According to Dr. Baxter, "cumulative lost profits through March 1995" were $112,352,000. *Id.* ¶ 51, Pl.App. 32; Baxter Rep. Ex. 6, Pl.App. 48–49.

Dr. Baxter calculates the lost profits associated with the divested assets by determining the remaining principal balances of the divested assets by using samples of MBS pools sold by Northeast during the breach-induced shrink. Baxter Rep. ¶ 55, Pl.App. 33. Dr. Baxter analyzed "all Freddie Mac[10] pools in excess of $1 million that were sold by Northeast during the quarters ending in September and December 1989 and in March, June and September 1991." *Id.* This sample constituted $486 million of MBS which was almost 28 percent of Northeast's total MBS sales. *Id.* Dr. Baxter contends that it was reasonable to conclude that these samples were representative of all the divested assets—therefore, they could be utilized to estimate the remaining balance of Northeast's divested assets each quarter. *Id.* ¶ 56, Pl. App. 33–34. Dr. Baxter multiplies the re-

---

**7.** The spread is the difference in interest a bank is paying and the income it is receiving.

**8.** Dr. Baxter claims that this calculation of the spread reflects the current market rates in each period, without the timing of when assets were acquired materially affecting the result. Baxter Rep. ¶ 42, Pl.App. 28–29. Dr. Baxter contends that using the actual spreads on the wholesale assets "reasonably approximates the profitability of holding the divested assets and replacing them as they run off." *Id.*

**9.** Purchased loans are those loans that Northeast had purchased from other institutions which were not originated by Northeast and did not come to Northeast through other savings and loans institutions that Northeast acquired. *Id.* ¶ 48, Pl.App. 31.

**10.** According to Dr. Baxter, Freddie Mac, the Federal Home Loan Mortgage Company (FHLMC) reports monthly information on unpaid principal balances or "pool factors" in an easily accessible form. *Id.* ¶ 55, Pl.App. 33.

maining principal balance on the divested assets by the same spread he used for the lost profits on the foregone assets to determine lost profits attributable to the divested assets. According to Dr. Baxter, the cumulative lost profits were $45,642,000 for the 1989–90 shrink and $27,980,000 for the 1991 shrink.

In reaching this conclusion, Dr. Baxter makes a number of assumptions. First, Dr. Baxter concludes that it is reasonable "that but for the breach, Northeast would have been able to maintain its asset base at or close to its pre-breach level of approximately $8 billion" through the end of 1993, and the bank's asset size would have been no smaller than the average assets reported for the quarter ending September 30, 1989, when FIRREA was signed into law. Baxter Rep. ¶¶ 37, 39, Pl.App. 26–27. Therefore, Dr. Baxter's model assumes a "but-for" bank with a tangible asset size of $6.7 billion in 1990. *Id.* ¶ 39, Pl.App. 27.[11] This figure takes into account Northeast's $1 billion asset shrink that occurred before FIRREA took effect and the determination that approximately $400 million of Northeast's 1990 asset shrink was due to compliance with non-breach aspects of FIRREA. *Id.* ¶¶ 38–39, Pl.App. 27. Further, under this model, in 1994, the "but-for" bank's tangible assets are reduced to $6.1 billion to account for $600 million of shrinkage attributable to restructuring before the sale of the bank to Shawmut. *Id.* ¶¶ 38, 40, Pl.App. 26–27.[12] Dr. Baxter also concludes that Northeast's planned shift from wholesale assets to retail assets would have been slowed in order to maintain this asset size. *Id.* ¶ 37, Pl.App. 26.[13]

Defendant argues that Plaintiff's lost profits theory fails because: 1) the breach was not the proximate cause of the damages, 2) the damages were not reasonably foreseeable, and 3) Plaintiff cannot calculate damages with reasonable certainty.

### Causation

Defendant argues that Plaintiff "cannot establish that the breach was the direct, proximate cause" of its damages because Plaintiff reduced its asset size for non-breach reasons, selling assets at fair market value does not cause harm, and Northeast's independent business decision to forego capital-raising opportunities to pursue other profitable opportunities breaks the chain of causation. Def. Mot. 36.

Defendant contends that the liquidation of Northeast's portfolio and its reduction of assets are consistent with its pre-FIRREA business plans to shrink the bank's wholesale holdings, citing a May 15, 1989 "Revised 1989 Business Plan" to show that Northeast planned to increase its wholesale asset shrinkage in 1989. Def.App. 3232.[14] Defendant also relies on an earlier 1989 Business Plan to show that Northeast had planned to reduce assets to $4.6 billion by the end of 1990, even including goodwill. Def.App. 3215. Moreover, according to Defendant's expert Mr. Fischel, intervening circumstances caused Northeast to reduce its assets including: 1) passage of the 1991 Federal Deposit Insurance Corporation Improvement Act which raised capital requirement ratios, and 2) severe economic recessions in Northeast's market areas. Fischel Rep. ¶ 14, Def. App. 134.

In response, Plaintiff points to testimony of the Chief Financial Officer of Northeast that without the breach, the bank would have remained at least as large as it had been.

---

11. Dr. Baxter uses the term "but-for" bank to describe Northeast absent FIRREA.

12. Dr. Baxter's opinion is that Northeast actually would have remained at an asset size of $8 billion, but uses $6.7 billion as a conservative assumption to take into account certain non-breach aspects of FIRREA which caused shrinkage of the bank. Baxter Rep. ¶¶ 37–38, Pl.App. 26–27.

13. According to Plaintiff, "[r]etail activities consist of making loans through branches and gathering deposits through the branch network to fund those loans," while "wholesale activities involve purchasing mortgage-backed securities or loans originated by others and funding those acquisitions through borrowings made from other financial institutions including the Federal Home Loan Bank system." Pl. Opp. 21, n. 7.

14. Plaintiff asserts that the May 1989 business plan on which Defendant relies was never submitted to the Board of Directors for approval. Pl. Opp. 14.

Plaintiff also points to contemporaneous documents, including public filings and business plans, which stated that the bank had reduced its asset size in anticipation of the breach. *See* Walters Dep. at 11, 14, 17, 70–71, Pl.App. 698–99, 706; Northeast Savings' Form 10–Q (Sept. 30, 1989), Pl.App. 240; Jan. 23, 1990 Letter from K. Walters to P. Weichman of the FDIC, Pl.App. 0273; June 1990 Business Plan, Pl.App. 308.

Defendant further argues that "to the extent Northeast's alleged lost profits resulted from its independent business decisions," a finding of causation is precluded. Def. Mot. 40–41. Dr. Thakor concluded that Northeast should have raised capital in order to capture the "reasonably certain profitable opportunities" it claims existed. *Id.* 41; Thakor Rep. ¶ 57, Def.App. 272. Plaintiff contends that capital was not "readily available" as Defendant argues, citing contemporaneous correspondence from its investment bank, a contemporaneous FDIC Internal Memorandum, and Dr. Baxter's expert report. Oct. 16, 1989 Letter from Shearson Lehman Hutton, Pl.App. 265 (stating that it was "highly unlikely that Northeast could raise significant capital that would count as Tier I, or core, capital"); June 19, 1990 FDIC Internal Memorandum, Pl.App. 383 (stating that "the current conditions for thrift equity issues are extremely poor"); Baxter Rep. Ex. 19, n. 9, Pl.App. 71 (stating that Northeast would have had to pay a discount rate of 16 percent in order to raise capital).

Genuine issues of material fact exist precluding summary judgment at this juncture. Causation presents a quintessential issue of fact. *See Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1356 (Fed.Cir. 2001) (stating that causation is a question of fact that the Circuit Court reviews under the clear error standard). Moreover, trial is appropriate when there are conflicting expert opinions which would be refined by the "fire of cross examination." *See Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1143 (Fed.Cir.1986) (describing "the refining fire of cross examination" as "a more effective means of arriving at the legal conclusion of obviousness vel non than perusal of ex parte affidavits and declarations of partisan experts lobbed at each other from opposing trenches").

### Foreseeability

In order to recover for lost profits, "the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting." *California Federal Bank v. U.S. (CalFed II),* 395 F.3d 1263, 1267 (Fed.Cir.2005).

Defendant urges that "[a]ll that was foreseeable was that Northeast would have to adjust its capital ratios in response to the breach—either by raising capital or shrinking the balance sheet." Def. Mot. 42. Neither of these responses, the Defendant argues, leads directly to lost profits. *Id.* 42. Moreover, Defendant argues, again, that the capital markets provided a "readily available" market for substitute capital that Northeast could have tapped. *Id.* 43.

Plaintiff argues that at the time of capital formation, Northeast would have had the same difficulties raising capital as the thrifts that it had acquired, and therefore could not have raised capital easily to pursue profitable opportunities. Pl. Opp. 25; *see also* Oct. 16, 1989 Letter from Shearson Lehman Hutton, Pl.App. 265; June 19, 1990 FDIC Internal Memorandum, Pl.App. 383; Baxter Rep. Ex. 19, n. 9, Pl.App. 71.

Foreseeability, like causation, is largely a factual matter. *See Bluebonnet,* 266 F.3d at 1355. In *CalFed I,* the Federal Circuit found that Plaintiff had "submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits." 245 F.3d at 1350. Similarly, Plaintiff here has submitted considerable evidence and expert testimony with regard to the foreseeability of its lost profits damages. This evidence has raised genuine issues of material fact regarding the availability of capital as well as the foreseeability of lost profits that preclude summary judgment.

### Reasonably Certain Measure of Damages

Defendant seeks summary judgment on the ground that Northeast cannot prove

damages with a reasonable amount of certainty. According to Mr. Fischel, Northeast's core operating income between 1989 and 1995, the time period for which Northeast claims lost profits, was negative, overall, and lost profits would be inconsistent with Northeast's historical performance. Fischel Rep. ¶ 20, Def.App. 138. Defendant further contends that Plaintiff's lost profits model is speculative because it assumes Northeast would have remained the same size. Mr. Fischel concludes that "[i]t is implausible to assume that the but-for bank would have maintained its size during this period (as Dr. Baxter assumes) when the actual bank reduced its size for reasons other than the alleged breach." *Id.* ¶ 14, Def.App. 134.

Defendant further argues that Dr. Baxter's assumptions concerning the type of assets Northeast would have maintained on its balance sheet were speculative. Defendant argues that Plaintiff's calculation is speculative and flawed by assuming only wholesale assets and fails to account for the added risk that retail assets such as commercial and consumer loans would have entailed as well as the losses Northeast would have suffered during recessions from 1990 to 1994. Def. Mot. 49–50.

Finally, Defendant argues that Northeast's damages calculation lacked reasonable certainty because its calculation assumes Northeast would have taken greater interest rate risk than the bank's actual strategy. Def. Opp. 51–53. According to Mr. Bankhead, Dr. Baxter's use of the average interest rate for assets and liabilities to create his spread created an overly positive spread in light of falling interest rates. Bankhead Rep. ¶¶ 63–64, Def.App. 91.

The parties' debate regarding whether Dr. Baxter should have used retail or wholesale assets and different interest rate risk assumptions highlights the underlying factual dispute, pointed battle among the experts, and the impossibility of resolving damages in this posture. *See, e.g.,* Dec. 1988 Business Plan, Pl.App. 157 (showing that movement from wholesale to retail assets would be gradual); Walters Dep. at 18, 71–72, Pl.App. 699, 706 (same); Interest Rate Risk Management Policy dated June 16, 1989, Pl.App.

229–30. *Cf. Globe,* 59 Fed.Cl. at 95 (finding that the government's contention that plaintiff's expert's interest rate spread was too large demonstrated that material facts were in dispute). In sum, the Court is unable to conclude on this record that the claimed lost profits were so uncertain as to preclude any recovery on this theory.

### Cost of Raising Additional Capital

Plaintiff also claims damages arising from the issuance of $35.2 million of preferred stock in connection with the 1992 acquisition of Rhode Island credit union branches from DEPCO. Dr. Baxter concludes that, although this transaction would have taken place without FIRREA in place, Northeast "would not have needed to sell $35.2 million of preferred stock to DEPCO" in order to complete the acquisition of the Rhode Island credit union branches, absent the breach. Baxter Rep. ¶ 58, Pl.App. 22. According to Dr. Baxter, if Northeast had been able to remain the size it was absent the breach ($6.7 million in assets), then under the but-for bank's capital ratios, Northeast could have completed the acquisition without resorting to raising capital. *Id.*

Dr. Baxter opines that Northeast was damaged in two separate ways in this transaction because it was required to comply with the new capital ratios and not allowed to include goodwill in its capital. First, Dr. Baxter concludes that Northeast suffered damages by being forced to sell $35.2 million of preferred stock to DEPCO. Dr. Baxter calculates damages resulting from this sale as the difference between "the dividends on the preferred stock (which were paid in additional shares) less the cost of funds savings generated by the cash received (measured on the basis of Northeast's cost of funds"). Baxter Rep. ¶ 58, Pl.App. 34. According to Dr. Baxter, this yields $6.681 million in damages. Baxter Rep. ¶ 58, Pl.App. 34; Baxter Rep. Ex. 14, Pl.App. 63. Second, Dr. Baxter concludes that Northeast was damaged because it would not have had to grant warrants to DEPCO absent the breach. According to Dr. Baxter, the warrants DEPCO received to invest in Northeast's common stock were "in the money" when issued, and he therefore calculated the damages from the grant of the

warrants at their value when issued. Dr. Baxter concluded that these damages were $2.95 million by calculating the value of the warrants as the difference between their exercise price and their market value at the date of issue—a calculation which he describes as very conservative. Baxter Rep. ¶ 59, Pl.App. 34–35; Baxter Rep. Ex. 14, Pl.App. 63.

Defendant argues that these damages are "premised upon the profitability in Dr. Baxter's lost profits model" and should be rejected on the same grounds. Def. Mot. 59. As noted above, a trial is necessary on lost profits. Defendant also argues that it is speculative that the credit unions would have completed these same transactions without the preferred stock if the breach had not occurred. *Id.* 59–60. Finally, Mr. Fischel notes that Northeast received a fair price for the stock that it issued, and the net cost of issuing the stock and warrants was zero. Fischel Rep. ¶ 31, Def.App. 143–44.[15]

Whether Plaintiff would have had to sell the preferred stock or grant the warrants to DEPCO absent the breach are questions of fact. While Defendant's expert has determined, based on the Board minutes, that DEPCO would have done so, Plaintiff's expert has opined using the "but-for bank's" capital ratios that the bank would not have had to issue the preferred stock. Further, while Defendant's expert has found that the net cost of issuing the preferred stock and warrants was zero, Plaintiff's expert has measured damages attributable to raising capital utilizing the difference between the dividends and cost of funds savings and the difference between the exercise price and market price of the warrants. *See* Baxter Rep. ¶ 58, Pl.App. 34. As such, summary judgment is inappropriate.

### Wounded Bank Damages

 Plaintiff further claims out-of-pocket expenses that Northeast incurred as a result of the breach. These expenses included advisory services in connection with capital-raising activity that Northeast ultimately did not undertake as well as additional insurance deposit premiums attributable to the government's breach. Baxter Rep. ¶¶ 60–62, Pl.

App. 35–36. Dr. Baxter calculated that Northeast incurred $313,000 in financial advisory services and filing fees for a contemplated capital-raising initiative through a shareholder rights offering. Baxter Rep. ¶ 60, Pl.App. 35. Dr. Baxter also calculated that Northeast had spent more in risk-based deposit insurance premiums than it would have absent the breach. *Id.* ¶ 62, Pl.App. 35–36. According to Dr. Baxter, absent the breach, Northeast would have had higher ratios of tangible, core and risk-based capital to its assets, resulting in lower insurance premiums and savings of $1,334,000. *Id.* ¶ 61–62, Pl.App. 34–35; Baxter Rep. Ex. 16, Pl.App. 66.

Defendant argues that these damages are unrecoverable because Northeast cannot establish that the breach caused the capital restraints in 1992–93. Def. Mot. 58. Defendant reiterates that a number of factors put pressure on Northeast's capital position other than FIRREA. *Id.;* 1992 Form 10–K, Def.App. 663, 665–66.

Dr. Baxter and Mr. Fischel have conflicting opinions with regard to whether the bank would have needed to raise additional capital and whether the bank would have been well-capitalized enough to avoid higher insurance premiums. These divergent opinions reflect underlying factual disputes and conflicting post-breach constructs which cannot be resolved on this record. Summary judgment is therefore inappropriate with regard to Plaintiff's wounded bank claims.

### Conclusion

1. For the reasons stated, Defendant's motion for summary judgment upon damages is **DENIED.**

2. A trial on damages will be held. from **Oct. 23–Nov. 3, 2006,** in Washington, D.C.

3. The Court will conduct a telephonic status conference on **Aug 1, 2006, at 10:00 a.m. EDT** to set a final pretrial schedule.

---

15. Defendant also states that it has numerous arguments with regard to methodological flaws in Dr. Baxter's calculations that will be addressed at trial if necessary. Def. Mot. 59.